In re Mark Donald GROGGEL, Debtor.

Carlota M. Bohm, Trustee of the Bankruptcy Estate of Mark Donald Groggel, Plaintiff,

v.

The Horsley Company, a Utah corporation, Defendant.

Bankruptcy No. 02–34080–MBM.

Adversary No. 03–3240–MBM.

United States Bankruptcy Court, W.D. Pennsylvania.

Nov. 10, 2005.

David B. Fawcett, Buchanan Ingersoll PC, Pittsburgh, PA, for the trustee.

John Newborg, Pittsburgh, PA, for the Horsley Company.

### MEMORANDUM OPINION

M. BRUCE McCULLOUGH,
Bankruptcy Judge.

Carlota Bohm, the Chapter 7 Trustee for the above-captioned debtor (hereafter "the Trustee"), brings the instant adversary action to pursue three separate causes of action, namely (i) one for breach of contract (Count 1), (ii) one for quantum meruit (Count 2), and (iii) one predicated upon the failure by the Horsley Company, the named defendant in the instant adversary proceeding (hereafter "Horsley"), to file a payment bond (Count 3). The Court, in a Memorandum and Order of Court dated February 13, 2004, granted Horsley's motion to dismiss, but only with respect to the Trustee's Count 3, *see In re Groggel,* 305 B.R. 234, 236 (Bankr.W.D.Pa. 2004); the first two of the Trustee's counts thus remain for disposition by the Court.

The Trustee's contract breach and quantum meruit causes of action against Horsley are actually causes of action that were owned by Mark Groggel, the instant debtor (hereafter "the Debtor"), prior to the commencement of his bankruptcy case, which causes of action the Trustee, by virtue of 11 U.S.C. § 541(a)(1), now owns for the benefit of the Debtor's bankruptcy estate. The Trustee seeks as damages in the instant adversary proceeding either $336,000 or, alternatively, $258,635.94, plus pre-judgment interest from February 15, 2000—the Trustee appears to ask for the same amount of damages regardless of which of her two causes of action she is proceeding under. For the reasons set forth below, the Court grants judgment (a) in Horsley's favor with respect to, that is denies any recovery on, the quantum meruit cause of action, and (b) in favor of the Trustee on the contract breach cause of

action, but only to the extent of $32,973 in damages.

### SUBJECT MATTER JURISDICTION

As the Court has previously held, "it undoubtedly possesses subject matter jurisdiction [via 28 U.S.C. § 1334(b)] over each of the three counts pled in the Trustee's complaint, albeit subject matter jurisdiction of the noncore 'related to' variety." *Groggel,* 305 B.R. at 237. The Court observes that the Trustee contends that the entirety of the instant adversary proceeding is a core matter by virtue of 28 U.S.C. § 157(b)(2)(E). Because § 157(b)(2)(E) provides nothing other than that an action for the turnover of property of the estate constitutes a core proceeding, *see* 28 U.S.C.A. § 157(b)(2)(E) (West 1993), the Trustee must necessarily argue that her causes of action constitute claims against Horsley for the turnover of property of the Debtor's bankruptcy estate. The Court disagrees with such position by the Trustee, however, because (a) the Trustee's claims against Horsley constitute nothing more than garden variety contract claims, that is claims wherein the right to property—i.e., money—is in dispute, and (b) "actions seeking a turnover of assets whose title is in dispute can only constitute, at the most, noncore rather than core proceedings given that such actions are not true turnover actions within the meaning of [11 U.S.C.] § 542(a) and 28 U.S.C. § 157(b)(2)(E)," *In re Allegheny Health, Education and Research Foundation,* 233 B.R. 671, 677–78 (Bankr.W.D.Pa.1999). Therefore, the Court holds once again that each of the Trustee's claims against Horsley constitute noncore matters, which means, in turn, that the Court may enter final orders and judgments regarding such claims only if the parties consent thereto, *see* 28 U.S.C.A. § 157(c) (West 1993).

Have both parties consented to the entry of final orders and judgments with respect to the Trustee's claims in the event that such claims constitute, as has now been determined, noncore matters? The Trustee, in ¶ 15 of her complaint, not only asserts that her claims constitute core matters but also expressly consents to the entry of final orders and judgments in the instant adversary proceeding even if such claims constitute noncore matters. Horsley responds in ¶ 15 of its answer by asserting that the Trustee's "[p]aragraph 15 is a conclusion of law and no response is required thereto." Unfortunately for Horsley, the Trustee's averment that the instant adversary proceeding is a core matter "is not the kind of allegation [by the Trustee] to which no responsive pleading is required. In fact, such a responsive pleading is explicitly required under Bankruptcy Rule 7012(b). *See* Fed.R.Bankr.P. 7012(b)." *In re Aero–Fastener, Inc.,* 177 B.R. 120, 132 (Bankr.D.Mass.1994). Consequently, and by virtue of Fed.R.Civ.P. 8(d) and Fed.R.Bankr.P. 7008(a), Horsley, by failing to admit or deny the Trustee's "core" averment, is deemed to have admitted that the instant adversary proceeding is core in nature. *See Id.* "Moreover, case authority exists for the proposition that a defendant's admission that a matter is core 'may be deemed *an expression of consent* to allowing ... [a bankruptcy] court to determine ... [a] matter, even if it is noncore.'" *In re Stipetich,* 294 B.R. 635, 650 (Bankr.W.D.Pa.2003) (emphasis added) (quoting *In re Grigsby,* 119 B.R. 479, 484 (Bankr.E.D.Pa.1990), *vacated on other grounds,* 127 B.R. 759 (E.D.Pa.1991)) (also noting that substantial case authority exists to the effect that, notwithstanding Bankruptcy Rule 7012(b)'s requirement of express consent by both parties, a party can *impliedly consent* to the entry of final orders and judgments by a bankruptcy court in noncore matters); *see also In re*

*Seatco, Inc.,* 259 B.R. 279, 283 (Bankr. N.D.Tex.2001) (same, citing *Hiser v. Neumann Medical Center, Inc. (In re St. Mary Hospital)*, 117 B.R. 125, 131 (Bankr. E.D.Pa.1990), and *Gravel and Shea v. Vermont Nat'l Bank*, 162 B.R. 961, 966 (D.Vt. 1993)). Therefore, the Court rules that Horsley has expressly consented to the entry of final orders and judgments with respect to the Trustee's instant claims. Because both parties have expressly consented to the entry by this Court of such final orders and judgments, the Court's ruling (as well as factual findings and legal conclusions) set forth herein, as well as that which was contained within the Court's February 13, 2004 decision, constitute final rather than proposed judgments/orders.

### STATEMENT OF FACTS

The genesis of the Trustee's contract breach and quantum meruit claims against Horsley is a contract between the Debtor, operating under the name of National Storage Systems (hereafter "NSS"), and Horsley that was finalized at some point during early July 1999 (hereafter "the Contract"). Although the Trustee and Horsley hotly dispute the terms of the Contract, which dispute is facilitated by the fact that the Contract was never reduced to one particular written document, let alone a signed, written agreement, the Trustee and Horsley agree on the following matters vis-a-vis the Contract that are relevant to a resolution of the Trustee's claims:

1. That the Debtor and Horsley entered into the Contract in early July 1999;

2. That pursuant to the Contract, the Debtor, as a subcontractor to Horsley, was to install a shelving system (i.e., shelving, mezzanine, and flooring) as part of a warehouse construction project in Tracy, California (hereafter "the Shelving"), for which construction project Horsley had contracted with the federal government (hereafter "the Tracy Job");

3. That, pursuant to the Contract, Horsley was to pay the Debtor a total of $336,000 in return for the Debtor's performance on the Contract—a July 9, 1999 purchase order drafted by Horsley and mailed to the Debtor (hereafter "the Purchase Order") indicates that the amount to be paid was $338,000, but the Debtor and Horsley agreed at trial that $336,000 was the actual contract price;

4. That, pursuant to the Contract, the Debtor was to provide things relevant to such installation like necessary transportation, labor and supervision, tools, and equipment; and

5. That, pursuant to the Contract, the same would be fully completed within three months from when the Debtor commenced performance, or roughly October 15, 1999.

The Debtor submitted to Horsley on July 2, 1999, his bid of $336,000 on the Tracy Job subcontract, which bid ultimately culminated in the Contract (hereafter "the Bid"). The Debtor personally visited the Tracy Job construction site (hereafter "the Construction Site") on July 7—8, 1999 (hereafter "the Site Visit"), or nearly one week after he submitted the Bid to Horsley. The Debtor thus necessarily concedes that he did not visit the Construction Site before making the Bid. The Debtor also testified that, prior to submitting the Bid, he failed to actually speak to Horsley. As well, the Debtor testified that Horsley failed to offer, and that he thus failed to attend, any sort of pre-bid meeting, which type of meeting, the Debtor conceded at trial, would typically have been held for a

construction project of the size of the Tracy Job.

The Debtor testified that he based the Bid on drawings and a materials list that he obtained prior to the submission of the Bid from Borroughs Corporation, another of Horsley's subcontractors (hereafter "Borroughs"). At trial, the Debtor conceded that such drawings were not detailed and were difficult to scale. The Debtor also testified at trial that when he made the Bid he neither knew how he was to install the Shelving, nor, for that matter, who would actually be the manufacturer for the mezzanine and flooring that were part of the Shelving (Borroughs was still taking bids regarding the manufacture of the mezzanine and flooring).

As it turns out, the warehouse floor upon which the Debtor was to install the Shelving was not level. As a result, contends the Debtor, he incurred significant costs to remedy such uneven flooring. However, the Debtor did not ascertain that such floor was uneven until he made the Site Visit, or after he had already made the Bid. Furthermore, the Debtor concedes that he was told by Horsley during the Site Visit that Horsley could do nothing to remedy such uneven flooring.

On July 9, 1999, Horsley sent the Purchase Order to the Debtor. The Debtor received the Purchase Order on July 14, 1999, see Def. Ex. H (Groggel document dated 2/29/00, at p. 2). In the bottom left-hand corner of the Purchase Order appears the following language: "NOTE: It is requested that you acknowledge this order IMMEDIATELY giving following information: ... (3) Any changes in price or specification necessary."

On July 15, 1999, the Debtor met with Borroughs officials for approximately a half day in Kalamazoo, Michigan regarding the Shelving work that the Debtor was to perform under the Contract, see Def. Ex. H (at p. 2). The Debtor testified that he did not learn that the flooring for the Shelving was required to be attached from underneath (i.e., from the bottom up) until such meeting. The Debtor testified that he informed Borroughs officials at that time that such attachment of such flooring would cost twice as much as if such flooring were attached from on top (i.e., from the top down). After learning of the flooring issue and the consequential increased cost as just described, the Debtor failed to amend the Bid price of $336,000 to take the same into account. At an October 21, 1999 meeting at the Construction Site—i.e., some three months after the Debtor had commenced performance under the Contract—someone from Borroughs, according to the Debtor's testimony, supposedly told the Debtor that Borroughs would reimburse the Debtor for any increased costs that were associated with the aforesaid flooring issue. The Debtor testified that he took the view that Borroughs was Horsley's agent and that such statement by Borroughs consequently bound Horsley as well to reimburse the Debtor for such increased costs.

As it turns out, the Debtor did not complete his performance under the Contract within three months, or approximately by October 15, 1999. Instead, the Debtor finished his performance under the Contract at some point in early February 2000. The Debtor affixes blame for the delay in completion of his contractual performance almost entirely, if not entirely, upon Horsley and/or Horsley's other subcontractors. Horsley disagrees, as one would expect, and contends instead that the Debtor was to blame for most, if not all, of the delay in completion of the Debtor's contractual performance.

The Debtor testified that he incurred substantial damages as a result of the delay in completion of his contractual per-

formance—which delay, as just set forth, he blames on Horsley—and the Debtor fixes such damages at $258,635.94. The Debtor, in a document entitled "NSS Itemized Damage Summary" (hereafter "the Debtor's Damage Summary"), identifies forty-four (44) separate damage items that comprise the total damage figure of $258,635.94, the overwhelming majority of which are simply increased costs for additional labor that either the Debtor or his workers had to perform, *see* Trustee's Ex. 95. The Debtor, in the Debtor's Damage Summary, broadly categorizes such damages as follows:

1. Failure by Horsley to Provide Adequate Unloading and Storage Areas (Damage Items 1—3)—$19,400, which is comprised of 620 additional labor hours at $30/hr. plus $800 for additional costs for rental equipment;

2. Failure by Horsley to Provide Materials Fit for Installation on a Timely Basis (Damage Items 4—23)—$44,390, which is comprised of 1,368 additional labor hours at $30/hr. and 50 additional supervisory hours at $55/hr.;

3. Inadequate Drawings Supplied by Either Horsley or its Subcontractors (Damage Items 24—37)—$102,490, which is comprised of 3,030 additional labor hours at $30/hr. and 196 supervisory hours at $55/hr.;

4. Working Conditions & Scheduling Issues (Damage Items 38—43)—$68,843.58, which is comprised of 1,390 additional labor hours at $30/hr. plus $27,143.58 for additional per diem expenses, travel, temporary lodging, etc. incurred subsequent to October 15, 1999; and

5. A Ten (10) Percent Administrative Fee (Damage Item 44)—$23,512.36, which fee is calculated by multiply-

ing the sum of the preceding items 1—4, or $235,123.58, by 0.10; such fee, testified the Debtor, was imposed solely so as to recover some reimbursement for his use during the duration of his contractual performance of his office and office equipment located at his personal residence in Pittsburgh, Pennsylvania.

The foregoing labor hours alleged by the Debtor to have been expended and for which the Trustee seeks a recovery at $30/hr. equals 6,408 hours; those for which the Trustee seeks a recovery at $55/hr. equals 246 hours. The Trustee also takes the position that the Debtor actually suffered delay damages in the amount of $336,000, which figure represents nothing more than twelve additional weeks of labor performed by the Debtor and his staff at a cost of $28,000/week. The Trustee arrives at the $28,000 weekly figure by simply dividing the original Contract price of $336,000 by 12 weeks, which period is roughly equivalent to the three month period in which the Contract was supposed to have been completed.

The Debtor himself subcontracted out a part of the Contract to an entity entitled Anchor Enterprises of Cleveland (hereafter "Anchor"). The Debtor testified that, according to such subcontract with Anchor, Anchor would share in any profit or loss that the Debtor realized on the Contract, with Anchor's split being 40 percent of such profit or loss and the Debtor's thus being 60 percent.

The Debtor testified that he anticipated, that is he forecasted, that he would make roughly a $60,000 profit on the Contract. Since the Contract called for total payments to the Debtor of $336,000, the Debtor necessarily budgeted—and testified as well that he budgeted—for total costs attributable to the installation of the Shelv-

ing to equal approximately $276,000 (i.e., $336,000—$60,000). Thus, the Debtor projected that he would earn roughly 21.74 percent on the total costs that he expected to expend under the Contract (i.e., $60,000 divided by $276,000). The Debtor testified that, in fact, he received total revenues from the Contract equal to $339,588.16; the additional $3,588.16 represents a payment that he received for some additional work that he performed regarding installation of the Shelving.

A document entitled "Summary Expense Report" for the Tracy Job was introduced into evidence by Horsley as Exhibit O (hereafter "the Expense Report"). The Debtor testified that (a) he authored the Expense Report, (b) the Expense Report was prepared relatively shortly after he completed his contractual performance at some point in February 2000—such testimony is corroborated by the date of 3/25/00 that appears in the bottom right-hand corner of the Expense Report, (c) he sent a copy of the Expense Report to Anchor since Anchor was to share in any profit or loss that emanated from the Contract, (d) the substance of the Expense Report is accurate, (e) the Expense Report sets forth the final compilation by the Debtor of all of the expenses that he incurred in performing under the Contract, save for overhead and some labor that the Debtor himself expended at his home office in Pittsburgh,[1] and (f) the Expense Report does not contain any allowance for a profit that would be derived from the Contract. The Expense Report reveals that (a) the total expenses that the Debtor actually incurred in performing under the

Contract, save for overhead and his home office labor, equals $389,040.30, (b) the total receipts that the Debtor received under the Contract equals $339,588.16, and (c) the Debtor's loss regarding the Contract, without consideration for overhead expense, equals $49,452.14 (i.e., $389,040.30—$339,588.16). The Court observes, and the Debtor also testified, that the Debtor's loss figure in the Expense Report of $49,452.14 is consistent with a loss figure of $39,391.59 as of January 11, 2000 (i.e., approximately two months prior to the date upon which the Expense Report was prepared) that the Debtor reported via fax not only to Borroughs but, by copy, to Anchor as well.

The Debtor testified that he utilized substantially the services of temporary laborers, and that he paid such temporary labor roughly $13 per hour. The Debtor testified that such rate is reasonable because, the Debtor testified as well, one can expect to pay between $12—$15 per hour for temporary labor depending upon where one is located in the United States. The Debtor also performed, while on the witness stand, several calculations whereby he would take total labor expenses for a particular labor supplier as set forth in the Expense Report and then divide such figure by a corresponding figure contained in the Trustee's Exhibit 103 for total time expended by such supplier on the Tracy Job. By performing such calculation, the Debtor ascertained, for instance, that he actually paid temporary labor obtained through Manpower a blended—that is, standard plus overtime—rate of $13.17 (i.e., $119,062.52 divided by 9,040 hrs.).

---

1. The Debtor actually testified that the Expense Report, under the heading "Labor Expenses" for NSS, also failed to capture an allowance for the Debtor's travel time and time that he spent negotiating with Horsley over the recapture of alleged extra costs. The Court concludes that it may neglect such time for purposes of resolving the instant adversary proceeding because an allowance therefor appears neither in the Expense Report nor in the Debtor's Damage Summary and, thus, such time is irrelevant to the Court's comparison and analysis of those two documents as set forth below.

The Debtor testified that he had performed a similar calculation for each of the entities that supplied him with labor on the Tracy Job, and that each such calculation yielded an accurate rate, on a blended basis (i.e., standard time plus overtime), for that which he paid each supplier. Performing such a calculation for each of the other such labor suppliers yields the following rates that were paid by the Debtor:

(a) Manpower—$13.17 (i.e., $119,062.52 divided by 9,040 hrs.)

(b) Kelly—$11.73 (i.e., $16,779.13 divided by 1,431 hrs.)

(c) Cont. Resources—$18.01 (i.e., $12,146.62 divided by 674.5 hrs.)

(d) Anchor—$18.78 (i.e., $51,466 divided by 2,740 hrs.)

(e) NSS (i.e., the Debtor)—$20.59 (i.e., $73,237.50 divided by 3,556 hrs.)

The Debtor also testified that it is standard in the construction industry for a contractor to mark up the cost of its labor, although the Debtor failed to testify formally as to what might be the industry standard amount or percentage for labor markup; the only testimony relevant to such issue is the Debtor's testimony that he knew that Borroughs regularly marked up its labor costs by twenty (20) percent.

The Debtor filed his Chapter 7 bankruptcy petition on December 31, 2002. The instant adversary proceeding was commenced by the Trustee's filing of her complaint on November 26, 2003. The Debtor is a Pennsylvania resident. Horsley is a Utah corporation. Before the Trustee commenced the instant adversary proceeding to pursue what are, as set forth above, causes of action that were owned pre-petition by the Debtor, the Debtor himself had pursued such causes of action in the Pennsylvania state court system, commencing with his filing of a complaint in the Pennsylvania Court of Common Pleas for Allegheny County on or about November 3, 2000 (hereafter "the Debtor's State Court Complaint"), see Ex. A to Horsley's Reply Br. to Plaintiff's Br. Opposing Horsley's Mot. to Dismiss (Doc. # 11) (St. Ct. Compl. at p. 10). The Debtor's State Court Complaint was ultimately dismissed for lack of personal jurisdiction over Horsley on July 2, 2001, see Ex. A to Horsley's Mot. to Dismiss (Doc. # 7) (PA Common Pleas Ct. Order dated 7/2/01); subsequent appeals failed and/or were denied on October 2, 2002, and June 10, 2003, see Ex's. B & C to Horsley's Mot. to Dismiss (Doc. # 7) (PA Superior Ct. Mem. dated 10/2/02 & PA Supreme Ct. Order dated 6/10/03). Horsley has timely raised in its answer to the Trustee's instant complaint the affirmative defenses that the Trustee's claims are barred by the applicable statutes of limitation and, with respect to the Trustee's quantum meruit claim, that the Trustee's complaint fails to state a claim upon which relief can be granted. See Horsley Answer, at pp. 9–10 (1st and 4th defenses).

A trial was held regarding the instant adversary proceeding on January 26 and 27, 2005. The Trustee offered but one witness at the trial, who was the Debtor himself. The bulk of the Debtor's testimony consisted of his explanation for each of the 44 line items contained in the Debtor's Damage Summary. Nothing was offered by the Trustee at trial to substantiate the Debtor's testimony, that is the Trustee failed to substantiate, for instance, that (a) the Debtor actually incurred 6,408 hours of additional labor and 246 hours of additional supervisory time subsequent to his expected completion date under the Contract of roughly October 15, 1999, or (b) the extra labor and supervisory time attributed to a particular issue and, thus, line item on the Debtor's Damage Summary was legitimate. Such observation is warranted (a) because, as the Court under-

stands it, the Debtor's Damage Summary was prepared by the Debtor some three to four years subsequent to the completion of the Contract, and in preparation for the instant trial, (b) because Debtor's Exhibit 103 (Debtor's Summary of Expended Labor Hours) also appears to have been prepared for trial rather than at some point during work on, or soon after completion of, the Contract, and (c) since the Trustee failed to produce at trial any documentation of the Debtor regarding additional labor time expended that was not prepared for trial—i.e., source documentation, such as time sheets or invoices from temporary labor agencies. More importantly, even presuming *arguendo* that the Debtor expended additional time regarding the Contract of the magnitude that he contends, the Trustee failed to substantiate the Debtor's testimony to the effect that such additional effort was the fault entirely of Horsley and/or its other subcontractors rather than the Debtor—for that matter, the Trustee offered little, indeed nothing, to the Court at trial that could now perhaps be used by the Court in an attempt to apportion between the Debtor and Horsley fault for the alleged extra time that the Debtor expended under the Contract. Because the Debtor was the lone witness that was produced by the Trustee at trial, it goes without saying that the Trustee also failed to produce any witness who could corroborate the testimony of the Debtor.

At the close of the Trustee's case, Horsley moved for a directed verdict, which motion, notwithstanding the Trustee's foregoing proof problems, the Court ultimately denied. After the Court's denial of such motion, Horsley defended—other than by way of the various exhibits that it produced during the course of its cross-examination of the Debtor—by offering into evidence the deposition transcripts of five individuals; Horsley did not produce any live witnesses. The five individuals

for whom deposition transcripts were so offered were two individuals from Anchor (namely George Archer, the owner thereof, and Kenneth Krajnak), two employees of Horsley (namely Mike Tooley and Ryan Briggs), and the widow of the deceased owner of Horsley (namely Nancy Horsley). The Trustee objected to the admission into evidence of the deposition transcripts of each of the three individuals affiliated with Horsley, that is Mike Tooley, Ryan Briggs, and Nancy Horsley, and perhaps objected as well to Horsley's use at trial of the deposition transcript of Kenneth Krajnak. The Court, for reasons set forth below, now overrules such objections, which means that such deposition transcripts are admitted into evidence in their entirety subject to particularized objections raised by the Trustee.

Because the three individuals affiliated with Horsley—i.e., Mike Tooley, Ryan Briggs, and Nancy Horsley—failed to appear and testify at trial, the Trustee also asks that the Court now draw an adverse inference from such absence. The Trustee furthermore asks that the Court now draw an adverse inference from the failure by Mike Tooley and Nancy Horsley to produce at trial or during discovery what the Trustee contends are relevant documents, namely, with respect to Mike Tooley, his notes pertaining to the Tracy Job (hereafter "Tooley's Job Notes"), and with respect to Nancy Horsley, a portion of Horsley's job file and financial records regarding the Tracy Job (hereafter respectively "Horsley's Tracy Job File" and "Horsley's Tracy Job Financials"). Additionally, the Trustee asks that the Court (a) find as fact that Mike Tooley and Nancy Horsley intentionally destroyed the aforesaid documents so as to prevent their availability for use during the trial of the Trustee's claims, and then (b) enhance, by virtue of such factual finding, the magni-

tude of the adverse inference that the Trustee asks the Court to draw from said individual's failure to so produce the aforesaid documents.

By letter dated April 5, 2000, sent by Horsley to the Debtor, Horsley offered to settle what now constitute the Trustee's claims against Horsley for a total payment by Horsley to the Debtor of $15,022 (hereafter "Horsley's Settlement Letter"). Horsley's Settlement Letter establishes that Horsley had previously settled with Borroughs on a portion of the Debtor's claim against Horsley that the Debtor contends arose as a result of mistakes or delays caused by Borroughs, Horsley's subcontractor, on the Tracy Job; such letter represents that the settlement offer made by Horsley to the Debtor included the total amount that Horsley received from Borroughs regarding their settlement. The Debtor rejected Horsley's settlement offer. Horsley's Settlement Letter constitutes Horsley's Exhibit K in the instant adversary proceeding, and was accepted by the Court into evidence over the Trustee's objections; the basis for the Court's overruling of such objection by the Trustee, as well as the extent of the Court's usage of Horsley's Settlement Letter, is set forth later in the instant opinion.

On March 2, 2004, Horsley filed a proof of claim in the Debtor's bankruptcy case for $56,539.50, which claim represents, according to the exhibit attached to such proof, "Expenses Incurred and Back Charged to National Storage" Systems by Horsley regarding work done by the Debtor on the Tracy Job. *See* Claims Register, Claim # 11. The total amount of unsecured debt owed by the Debtor at the time of his bankruptcy petition filing, as set forth in his Amended Bankruptcy Schedules E and F, equals $130,230.24 (i.e., $4,500.00 + $125,730.24). The Trustee's counsel shall receive as compensation for

its representation of the Trustee in the instant matter forty (40) percent of any amount that the Trustee might receive by way of judgment or otherwise respecting the Trustee's claims against Horsley. *See* Ex. A to Trustee's App. to Employ Special Counsel (Doc. # 11, main case) & 12/30/03 Court Order Granting Trustee's App. (Doc. # 24, main case). According to the Debtor's Bankruptcy Schedules I and J, the Debtor presently earns $1,274.56 on a net monthly basis, and incurs monthly expenses of $2,549.00. The Debtor's Bankruptcy Schedule B contains a full page attachment listing numerous items of machinery and equipment that the Debtor utilized in his shelving construction business, but such schedule does not list, either in such attachment or elsewhere in such schedule, any office equipment or supplies. The Debtor testified at trial, and told the Trustee as well at the § 341(a) Creditor's Meeting, that he filed for bankruptcy because of the damages that he allegedly sustained as a result of Horsley's alleged breach of the Contract, *see* Trustee's 341(a) Meeting Minutes, Case No. 02–34080, Doc. No. 6 (§ 341(a) Meeting held 2/21/03). The Court may and does take judicial notice of each of the documents that contain the information set forth in the instant paragraph.

## DISCUSSION

### I. *Choice of Law.*

The Debtor is a Pennsylvania resident, Horsley is a Utah corporation, all face-to-face contacts regarding formation of the Contract occurred in California, and the Contract was performed entirely in California. So which state's law—i.e., that of Pennsylvania, that of Utah, or that of California—controls resolution of the instant adversary proceeding? The parties agree that it does not matter which state's law applies provided that the laws of the three

competing states do not differ. However, Horsley contends that there are differences in the law between the three competing states that are relevant to a resolution of the instant matter; the Trustee disagrees, arguing that a relevant difference does not exist between the laws of the three competing states.

■ As an initial matter, this Court agrees with those courts that hold that "[f]ederal courts[, including bankruptcy courts,] use the choice of law rules of the state in which the court sits" to resolve conflicts of law issues. *In re Master Mortgage Investment Fund, Inc.*, 151 B.R. 513, 518 (Bankr.W.D.Mo.1993); *see also In re Presque Isle Apartments, L.P.*, 118 B.R. 332, 334 & n. 1 (Bankr.W.D.Pa.1990) (noting a disagreement among the courts but ultimately holding that "choice-of-law rules of the state of the forum apply"); *In re O.P.M. Leasing Services, Inc.*, 28 B.R. 740, 747–48 (Bankr.S.D.N.Y.1983) (same). Consequently, "[a]s a federal bankruptcy court sitting in the state of . . . [Pennsylvania] and deciding a question that will be controlled by state law, this Court must use the choice of law rules used in the state of . . . [Pennsylvania]." *Master Mortgage Investment*, 151 B.R. at 518; *see also Presque Isle Apartments*, 118 B.R. at 334 (same).

■ "In Pennsylvania, choice of law analysis first entails[, as the parties herein agree,] a determination of whether the laws of the competing states actually differ. If not, no further analysis is necessary." *Ratti v. Wheeling Pittsburgh Steel Corp.*, 758 A.2d 695, 702 (Pa.Super.Ct.2000). As set forth below, the Court concludes that the law in Pennsylvania and that in California diverge in at least two respects that are significant to a resolution of the instant matter—in particular, differences exist, as explained below, between the laws of those two states re-

garding the relevant statute of limitations to apply to a quantum meruit cause of action, such as is the Trustee's Count 2, and the circumstances under which such a claim can be pursued when an express contract exists. Therefore, the Court must proceed to determine which state's law controls the resolution of the instant matter.

■ "The choice-of-law rules of Pennsylvania [generally] employ a significant relationship test. . . . [Under such test,] Pennsylvania looks to the substantive law of the place with the most significant relationship to the parties and the transaction or the 'center of gravity' of the contract." *Presque Isle Apartments*, 118 B.R. at 334 (citing *Neville Chemical Co. v. Union Carbide Corp.*, 422 F.2d 1205 (3rd Cir.1970)). "In contract actions, controlling factors to a court's determination of applicable law [under the significant relationship test] are where the contract was made and where the contract was to be performed." *Rhodes v. Superior Investigative Services, Inc.*, 437 F.Supp. 1012, 1016 n. 2 (E.D.Pa. 1977). Furthermore,

[i]t is well-settled that matters connected with the performance of a contract are governed by the law prevailing at the place of performance. "Where the contract is either expressly or tacitly to be performed in any other place, the general rule is, in conformity to the presumed intention of the parties, that the contract . . . is to be governed by the law of the place of performance."

*Koffman v. Smith*, 453 Pa.Super. 15, 682 A.2d 1282, 1289 (Pa.Super.Ct.1996) (citations omitted); *see also* 12 P.L.E.2d *Contracts* §§ 2 & 3 at 19–20 (Bender 2001) (same). Applying the foregoing choice-of-law rules to the instant matter, the Court holds that, because the Contract was both made and wholly performed in California, the substantive state law of California con-

trols the resolution of all of the contract issues in the instant matter.

 With respect to the relevant statute of limitations to apply in the instant matter, the Pennsylvania choice-of-law rule is that "the law of the forum[, that is Pennsylvania,] rather than the law of the place where the cause of action arises or the place where any contract is executed determines the time within which a cause of action is enforceable." 31 P.L.E.2d *Limitation of Actions* § 6 at 191–192 (Bender 2003) (citing, *inter alia, Prince v. Trustees of University of Pennsylvania,* 282 F.Supp. 832, 837 (E.D.Pa.1968)); *see also Ross v. Johns–Manville Corp.,* 766 F.2d 823, 826 (3rd Cir.1985) ("Pennsylvania courts ordinarily apply the Pennsylvania statute of limitations"). "In Pennsylvania, [however,] the rule that the law of the forum governs is modified by the so-called 'borrowing statute [found at 42 Pa. C.S.A. § 5521],' which substantively provides that if a cause of action is [earlier] barred by the law of the place where it arises, that bar applies to an action brought in Pennsylvania courts." 31 P.L.E.2d *Limitation of Actions* § 7 at 192; *see also Prince,* 282 F.Supp. at 837 (same); *Ross,* 766 F.2d at 827–28 (same); 42 Pa. C.S.A. § 5521(b) (Purdon's 2005) ("The period of limitation applicable to a claim accruing outside this Commonwealth shall be either that provided or prescribed by the law of the place where the claim accrued or by the law of this Commonwealth, whichever first bars the claim"). In applying Pennsylvania's borrowing statute, "Pennsylvania law determines where the cause of action arises." 31 P.L.E.2d *Limitation of Actions* § 7 at 193 (citing *Prince* and *Ross*). Under Pennsylvania law, a contract breach claim arises where the contract was performed. *See Wholesale Supply Co. v. South Chester Tube Co.,* 20 F.R.D. 310, 314 (E.D.Pa.1957) (action for breach of contract that was performed in

Mississippi arises in Mississippi); *Bachmann v. Blaw–Knox Co.,* 198 F.Supp. 617, 620–21 (W.D.Pa.1961) (action for breach of contract that was performed in Venezuela arises in Venezuela). Applying the foregoing limitations period choice-of-law rules to the instant matter, the Court holds that, because the Contract was wholly performed in California, both of the Trustee's remaining counts for contract breach and quantum meruit arose in California. Consequently, not only Pennsylvania's relevant statute of limitations but also that of California must be consulted with respect to each of the Trustee's instant claims so as to determine whether such claims are barred; ultimately the Court must apply to each such claim whichever of the two states' relevant limitations periods would operate to first bar such claim.

## II. *The Trustee's Quantum Meruit Cause of Action.*

The Trustee's quantum meruit cause of action may be succinctly summarized as follows: Although a relationship between the Debtor and Horsley existed that is founded upon the Contract, and even though the Debtor did not rescind the Contract and thus a suit for restitution cannot be brought, the Debtor, alleges the Trustee, performed services wholly outside the scope of the Contract, which services, argues the Trustee, by themselves legally entitle the Debtor, and now the Trustee, to a recovery under the theory of quantum meruit. The legal basis for such position by the Trustee is the decision in *Drysdale v. Woerth,* 153 F.Supp.2d 678 (E.D.Pa. 2001). The *Drysdale* court held, in particular, that "[al]though unjust enrichment [ (i.e., a recovery under quantum meruit) ] is inapplicable when the relationship between the parties is founded on a written agreement or express contract [that is not rescinded], an unjust enrichment claim

may go forward when one party performs services wholly outside the scope of the contract." *Id.* at 687. The Court, for several reasons set forth below, holds that the Trustee may not recover from Horsley under a theory of quantum meruit.

■ First, and as explained above, the substantive state law of California rather than that of Pennsylvania controls the resolution of all of the contract issues in the instant matter. Therefore, a threshold issue that must be resolved in the instant matter is whether California law, like Pennsylvania law as expressed in *Drysdale,* provides for a quantum meruit recovery in the face of an unrescinded express contract simply because a party to such contract has performed services outside the scope of such contract. The Court, after a search for authority on the issue that can only be described as frankly vain, holds that California law does not provide for such a quantum meruit recovery. The Court describes its aforesaid search for authority as vain because it can locate but one case that directly addresses the issue, which lone case, as luck would have it, is unpublished and, pursuant to the California Rules of Court, may thus neither be cited or relied upon, notwithstanding that such decision appears to reject the *Drysdale* line of reasoning vis-a-vis a quantum meruit recovery. Nevertheless, the Court holds that California law does not recognize the *Drysdale* line of reasoning because (a) the Court does not find any published legal authority in California that is accepting of such reasoning, and (b) California law is explicit in recognizing two distinct exceptions to the rule that a quantum meruit recovery is unavailable when an unrescinded express contract exists, which two exceptions are unlike the exception set forth in *Drysdale, see Chodos v.*

*West Publishing Co., Inc.,* 292 F.3d 992, 1001 (9th Cir.2002) (quoting from *Oliver v. Campbell,* 43 Cal.2d 298, 306, 273 P.2d 15 (Cal.1954), to the effect that a quantum meruit recovery is allowable even if a contract is fully performed (i.e., not rescinded) "if any part of the consideration due [under such contract] from the defendant in return is something other than a liquidated debt"); [2] 11pt1 Cal. Jur.3d *Building and Construction Contracts* § 21 (West 2005) (citing, at footnote 70, *Opdyke & Butler v. Silver,* 111 Cal.App.2d 912, 245 P.2d 306 (1952); *Daugherty Co. v. Kimberly–Clark Corp.,* 14 Cal.App.3d 151, 92 Cal.Rptr. 120 (1971); and *C. Norman Peterson Co. v. Container Corp. of America,* 172 Cal. App.3d 628, 218 Cal.Rptr. 592 (1985), for the proposition that, within the context of a construction contract, a quantum meruit recovery is allowable even if such contract is not rescinded if the parties thereto are found to have mutually abandoned such contract, that is if such parties are found to have intended to disregard such contract, which finding requires a showing that there were significant changes to such contract of such a magnitude as to alter the scope of the work that was contemplated by the parties to have been performed thereunder). Because California law does not provide for a quantum meruit recovery in the face of an unrescinded express contract simply because a party thereto has performed services outside the scope of such contract, the Trustee's quantum meruit claim, based as it is solely upon such theory for relief, necessarily must fail.

■ Second, Horsley contends, and the Court agrees, that the Trustee's quantum meruit cause of action, based as it is solely upon the theory for relief advanced in *Drysdale,* would be barred by the applica-

---

**2.** The terms "quantum meruit," "restitution," and "quasi-contract" are used by the California courts interchangeably. *See Chodos,* 292 F.3d at 1001 n. 8.

ble statute of limitation even if such cause of action were recognized under California law. The Court recognizes that (a) the statute of limitations in Pennsylvania for a quantum meruit action is four years, *see* 31 P.L.E.2d *Limitation of Actions* § 19 at 215, (b) the Trustee's quantum meruit cause of action could have accrued neither any earlier nor any later than at some point in February 2000, which is when the Debtor completed his performance under the Contract, (c) the instant adversary proceeding was commenced on November 26, 2003, when the Trustee filed her complaint, (d) the Trustee, under Pennsylvania's four-year limitations period, thus had until at some point in February 2004 to timely file her complaint, which deadline she satisfied, and (e) the Trustee's quantum meruit claim thus is not time barred by Pennsylvania's relevant statute of limitation. However, and as set forth above, the Trustee's quantum meruit cause of action is time barred by California's relevant statute of limitations—even if it is not time barred by Pennsylvania's relevant statute of limitations—if such time bar in California would operate to bar such claim. Would California's relevant statute of limitations operate to bar the Trustee's quantum meruit claim if it were recognized under California law? As explained below, the Court concludes that it would.

As an initial matter, the Court notes that California has a four-year statute of limitations for actions (a) "upon any contract, obligation or liability founded upon an instrument in writing," Cal.Code § 337(1) (West 2005), and (b) "based upon the rescission of a contract in writing," Cal.Code § 337(3) (West 2005). California also has a two-year statute of limitations for actions (a) "upon a contract, obligation or liability not founded upon an instrument of writing," Cal.Code § 339(1) (West 2005), and (b) "based upon the rescission of a contract not in writing," Cal.Code § 339(3)

(West 2005). Which limitations period would be relevant to the Trustee's quantum meruit claim if it were recognized under California law? Because the Trustee's quantum meruit claim is based upon the reasoning in *Drysdale,* and since *Drysdale* allowed for a quantum meruit recovery even in the presence of an unrescinded express contract, the California limitations periods for actions based upon contract rescission—i.e., Cal.Code §§ 337(3) and 339(3)—could not possibly apply to such claim. As between the four-year limitations period provided by Cal.Code § 337(1) and the two-year limitations period provided by Cal.Code § 339(1), the Court holds that the two-year limitations period set forth in Cal.Code § 339(1) would apply to the Trustee's quantum meruit claim were such claim recognized in California because (a) the four-year limitations period set forth in Cal.Code § 337(1) is reserved for actions upon a written contract, and (b) a quantum meruit claim based upon the reasoning in *Drysdale,* as is the Trustee's claim, *constitutes not a suit upon an express contract but rather* a suit for recovery for services performed outside of such contract or, put differently, *a suit upon a second contract that must be implied-in-law, see* 43 Cal. Jur.3d *Limitation of Actions* § 36 (West 2005) (the two-year statute of limitations provided in Cal.Code § 339(1) applies to actions on "quasi-contracts implied in law"). Consequently, even if a quantum meruit cause of action based upon the reasoning in *Drysdale* were recognized under California law, such cause of action would be subject to the two-year statute of limitations provided in Cal.Code § 339(1).

 Applying California's two-year statute of limitations to the Trustee's quantum meruit claim, the Court concludes that the Trustee would be found to have filed such claim in an untimely manner

even if such claim were recognized under California law. The Court so concludes because (a) such claim of the Trustee, as set forth above, did not accrue any later than at some point in February 2000, and (b) two years from February 2000 is February 2002, which date had long since passed (i) when the Trustee's adversary complaint was filed on November 26, 2003, and (ii) even when the Debtor filed his Chapter 7 bankruptcy petition on December 31, 2002, thereby precluding use by the Trustee of the time extensions provided for in 11 U.S.C. § 108, *see* 11 U.S.C.A. § 108 (West 1993) (each of the time extensions provided in paragraphs (a), (b), and (c) of § 108 only apply if the statute of limitations provided by nonbankruptcy law "has not expired before the date of the filing of the [bankruptcy] petition"). The Court concludes furthermore that the preceding holding is unaffected by (a) the fact that the Debtor himself initially pursued, and in a timely fashion, the quantum meruit cause of action that is now pursued by the Trustee in Pennsylvania state court, (b) the fact that such lawsuit timely brought in Pennsylvania state court was ultimately dismissed only for lack of personal jurisdiction, and (c) an application of California's limitations period equitable tolling doctrine as set forth in *Bollinger v. National Fire Insurance Co.*, 25 Cal.2d 399, 154 P.2d 399 (1944), to the quantum meruit cause of action first brought by the Debtor and now brought by the Trustee. The Court so holds because (a) the *Bollinger* rule of equitable tolling, which rule can be applied " 'to serve the ends of justice where technical forfeitures would unjustifiably prevent a trial on the merits,' " *Gordon v. Law Offices of Aguirre & Meyer*, 70 Cal.App.4th 972, 979, 83 Cal.Rptr.2d 119 (Cal.Ct.App.1999) (quoting from *Bollinger*), will only apply if "plaintiffs are left without a judicial forum for resolution of their claims through forces outside their control," *Gordon*, 70 Cal.App.4th at 980 n. 8, 83 Cal.Rptr.2d 119, and (b) "[u]nlike the plaintiff in *Bollinger*, plaintiffs here [ (i.e., herein first the Debtor and now the Trustee) ] were not denied a trial on the merits due to any error of the [Pennsylvania] trial court, but because they mistakenly filed suit against ... [Horsley] in ... Pennsylvania," *Id.* Therefore, even if a quantum meruit claim like the Trustee's, based as it is on *Drysdale*, were recognized under California law, such quantum meruit claim nevertheless would have been time barred by virtue of application of California's two-year statute of limitation set forth in Cal. Code § 339(1).

Third, even if California law were consistent with *Drysdale* such that a quantum meruit cause of action could be brought in California based simply on the fact that one party to an unrescinded express contract performs services wholly outside the scope of such contract, and even if such cause of action as is brought by the Trustee would not be time barred, the Court holds, after the benefit of a trial on this matter and a consideration of the extra work that the Debtor alleges that he performed when installing the Shelving, that the Trustee failed to preponderantly prove that the Debtor performed any services that could be considered to be wholly outside the scope of the Contract. Thus, the Trustee's quantum meruit cause of action fails in any event.

Finally, the Court holds that, even if the Trustee had pled as much, her quantum meruit claim could not have succeeded under the theories allowing for a quantum meruit recovery as set forth in either *Chodos* and *Oliver*, on the one hand, or *Opdyke, Daugherty,* and *Norman Peterson*, on the other hand. The Court so holds with respect to *Chodos* and *Oliver* because (a) such cases, as set forth above, both require, in order for a plaintiff to obtain a

quantum meruit recovery in the face of an unrescinded express contract, that some part of the consideration due under such contract from the defendant be something other than a liquidated debt, and (b) the only consideration that was ever due from Horsley to the Debtor under the Contract was a liquidated debt, namely one for $336,000, which amount has already been paid by Horsley. The Court holds as it does with respect to *Opdyke, Daugherty,* and *Norman Peterson* because the Trustee has not even alleged, let alone come close to preponderantly proving, that:

(a) Horsley radically redesigned the construction project at issue (i.e., the Shelving installation project), as was the case in *Opdyke, Daugherty,* and *Norman Peterson;*

(b) Horsley imposed significant changes to the Contract of such a magnitude so as to alter the scope of the work that was contemplated by the parties to have been performed thereunder—such changes were imposed by the defendants in *Opdyke, Daugherty,* and *Norman Peterson;* and

(c) both Horsley and the Debtor intended to disregard, and thus mutually abandoned, the Contract—such intent and consequent mutual abandonment is the crux of the decisions in *Opdyke, Daugherty,* and *Norman Peterson.*

Indeed, the most that the Trustee can even be said to have alleged is that:

(a) during the installation of the Shelving there were some changes to the anticipated manner in which such in-

stallation would be completed, which allegation is a far cry from one that there was a radical redesign of either the Shelving or the manner in which it would be installed; and

(b) the Debtor performed some work regarding installation of the Shelving that exceeded the scope of the Contract,[3] which allegation is a far cry from one that Horsley imposed changes to the Contract of such a magnitude so as to alter the scope of the work that was to be performed thereunder, that is that after such changes one could no longer discern the scope of the work that was initially contemplated to be performed thereunder.

Because such allegations, even if proven, would miss the mark were the Trustee to try and align her quantum meruit claim with the decisions in *Opdyke, Daugherty,* and *Norman Peterson,* the Court must conclude that such claim could not be successfully predicated upon the theory for relief set forth in such cases.

In light of all of the foregoing, the Trustee may not recover from Horsley under a theory of quantum meruit, which means that the Court shall grant judgment in Horsley's favor with respect to the Trustee's quantum meruit cause of action (i.e., the Trustee's Count 2).[4]

### III. *The Trustee's Breach of Contract Cause of Action.*

As set forth in the statement of facts above, the Trustee contends that (a) Horsley—either personally or by way of its other subcontractors on the Tracy Job—

---

3. As set forth above, the Court concludes that the Trustee failed to preponderantly prove that any of the installation work that the Debtor performed was outside the scope of the Contract.

4. The Court also holds summarily that the Trustee, in any event, ultimately could do no better on her quantum meruit cause of action than she does on her contract breach cause of action.

breached the Contract by allegedly preventing the Debtor from timely completing the Contract, that is by allegedly causing a delay in the Debtor's completion of his performance under the Contract, and (b) the Debtor suffered damages as a result of such actions by Horsley equal to either $336,000 or, alternatively, $258,635.94, plus pre-judgment interest from February 15, 2000.

■■ "Under California law, the elements of a breach of contract claim are: (1) the existence of a contract; (2) plaintiff's performance or excuse for nonperformance; (3) defendant's breach; and (4) resulting damage to plaintiff." *EPIS, Inc. v. Fidelity and Guaranty Life Insurance Co.,* 156 F.Supp.2d 1116, 1124 (N.D.Cal. 2001) (citing *Reichert v. General Ins. Co.,* 68 Cal.2d 822, 69 Cal.Rptr. 321, 442 P.2d 377 (1968)); *see also Amelco Electric v. City of Thousand Oaks,* 27 Cal.4th 228, 115 Cal.Rptr.2d 900, 38 P.3d 1120, 1129–30 (2002) (same); 14pt1 Cal. Jur.3d *Contracts* § 316 (West 2005) (same).

■■ Unless the express provisions of a subcontract provide otherwise, "as between a subcontractor and the contractor who is in control of the work being performed, the law places the latter under an obligation to make good all losses consequent on delays in the progress of the work not attributable to the subcontractor." *Hickey v. Los Angeles Jewish Community Council,* 128 Cal.App.2d 676, 276 P.2d 52, 59 (1954). Thus, absent an express provision in a subcontract to the contrary, a primary contractor is liable under a breach of contract theory for any delay damages that are incurred by one of its subcontractors to the extent that such damages are caused by other of such primary contractor's subcontractors.

■■ A primary contractor will be liable for a misrepresentation, either express or by way of omission with a duty to disclose, if a subcontractor reasonably relies thereon and is unable to perform according to the provisions of a subcontract. *See Gogo, et al. v. Los Angeles County Flood Control Dist.,* 45 Cal.App.2d 334, 114 P.2d 65, 67 & 69 (1941); *Wiechmann Engineers v. State Dept. of Public Works,* 31 Cal.App.3d 741, 753, 107 Cal.Rptr. 529 (1973) ("A careless contractor cannot convert his own lack of diligence into a case of fraudulent concealment"); *Norman Peterson,* 172 Cal.App.3d at 643, 218 Cal.Rptr. 592. "Similarly, by furnishing plans and specifications to the [sub]contractor, the ... [primary contractor] impliedly warrants their correctness and if they are incorrect, the ... [primary contractor] has breached the warranty," 11pt1 Cal. Jur.3d *Building and Construction Contracts* § 23 (West 2005) (citing *Souza & McCue Construction Co. v. Superior Court of San Benito County,* 57 Cal.2d 508, 20 Cal.Rptr. 634, 370 P.2d 338, 340 (1962), and *Norman Peterson,* 172 Cal.App.3d at 643, 218 Cal. Rptr. 592), for which breach the primary contractor is liable but only if the subcontractor reasonably relied upon such plans and specifications, *see Souza,* 20 Cal.Rptr. 634, 370 P.2d at 339–40 (contractor must act reasonably in being misled); *Wunderlich v. State Dept. of Public Works,* 65 Cal.2d 777, 56 Cal.Rptr. 473, 423 P.2d 545, 549 (1967) (if plans and specifications are so deficient or inadequate that it cannot make an intelligent bid, then plaintiff should refrain from doing so); *Jasper Construction, Inc. v. Foothill Junior College District of Santa Clara County,* 91 Cal. App.3d 1, 10–12, 153 Cal.Rptr. 767 (Cal.Ct. App.1979), that is only if the ambiguities, errors, or omissions in such plans and specifications would not have been apparent to the subcontractor acting with reasonable care, *see Ecco–Phoenix Electric Corp. v. Howard J. White, Inc.,* 1 Cal.3d

266, 81 Cal.Rptr. 849, 461 P.2d 33, 36 (1969).

 A primary contractor is liable for representations made by its subcontractor to a third party if the subcontractor is an agent of such primary contractor.

An agency is either actual or ostensible. ([Cal.]Civ.Code, § 2298.) "An agency is ostensible when the principal intentionally, or by want of ordinary care, causes a third person to believe another to be his agent who is not really employed by him." ([Cal.]Civ.Code, § 2300.) To establish ostensible authority in an agent, it must be shown the principal, intentionally or by want of ordinary care, has caused or allowed a third person to believe the agent possesses such authority. ([Cal.]Civ.Code, § 2317).

*Preis v. American Indemnity Co.*, 220 Cal. App.3d 752, 761, 269 Cal.Rptr. 617 (Cal.Ct. App.1990); *see also Associated Creditors' Agency v. Davis*, 13 Cal.3d 374, 118 Cal. Rptr. 772, 530 P.2d 1084, 1100 (1975) (same); *People v. Torres*, 136 Cal.App.3d 556, 562, 186 Cal.Rptr. 385 (Cal.Ct.App. 1982) (same). "Ostensible authority is not established by the statements and representations of the agent. It is created only by the acts or declarations of the principal." *Torres*, 136 Cal.App.3d at 562, 186 Cal.Rptr. 385; *see also Preis*, 220 Cal. App.3d at 761, 269 Cal.Rptr. 617 (same); *Associated Creditors' Agency*, 118 Cal. Rptr. 772, 530 P.2d at 1100 (same). "The burden of proving the existence of an actual or ostensible agency, as well as the scope of the agent's authority ..., rests on the party asserting the existence of the agency and thereby seeking to charge the principal on the representations of the agent." 2pt2 Cal. Jur.3d *Agency* § 169 (West 2005).

 "The burden of proof is on the party claiming damages to prove that he or she has suffered damage and to prove

the elements of those damages with reasonable certainty." 23 Cal. Jur.3d *Damages* § 186 (West 2005). "Uncertainty as to the fact of damage, that is, as to the nature, existence, or cause of damage, is fatal to a recovery." 23 Cal. Jur.3d *Damages* § 31 (West 2005) (citing, *inter alia*, Cal.Civ.Code § 3301); *see also Id.* at § 32 (same); *Stephan v. Maloof*, 274 Cal.App.2d 843, 850, 79 Cal.Rptr. 461 (Cal.Ct.App. 1969) (same). Thus, "[i]n an action for breach of contract, the plaintiff must prove that the breach was the cause of the damage[, and] ... the extent of the damage he or she sustained as a result of the breach." 23 Cal. Jur.3d *Damages* § 186. "[W]here there is no uncertainty as to fact of damage, that is, as to its nature, existence or cause, the same certainty as to its amount is not required." *Stephan*, 274 Cal.App.2d at 850, 79 Cal.Rptr. 461; *see also Acree v. General Motors Acceptance Corp.*, 92 Cal. App.4th 385, 398, 112 Cal.Rptr.2d 99 (Cal. Ct.App.2001) (same); 23 Cal. Jur.3d *Damages* §§ 31, 32 & 186 (same). "The law requires only that some reasonable basis of computation be used, and the result reached can be a reasonable approximation." *Acree*, 92 Cal.App.4th at 398, 112 Cal.Rptr.2d 99; *see also* 23 Cal. Jur.3d *Damages* § 32 (once fact of damage is certain, the amount of actual damage is to be determined by "liberal rule," that is "with as great a degree of certainty as the circumstances permit, and it is often necessary to refer the problem of determining its extent to the discretion of the court or the jury").

Applying the foregoing law to the Trustee's breach of contract claim, the Court determines that the Trustee is entitled to recover $32,973, inclusive of prejudgment interest, on such claim. The rationale for such determination is set forth below.

As an initial matter, the Court makes the following findings and draws the following conclusions:

1. A contract, indeed the Contract, existed between the Debtor and Horsley. The parties do not even dispute such fact.

2. The Debtor completed performance under the Contract, albeit later than expected. Although, after reviewing Horsley's $56,539.50 proof of claim in the instant case, the Court understands Horsley to apparently contend that it needed to complete certain things regarding installation of the Shelving that the Debtor allegedly failed to complete himself, the Court understands Horsley to concede that the Debtor at least substantially performed under the Contract.

3. Horsley contends that only Borroughs, Horsley's subcontractor, and never Horsley itself, contractually agreed to provide the Shelving materials to the Debtor which the Debtor was then to install. The Court disagrees with such contention by Horsley. Horsley, by virtue of accepting the Bid, contractually agreed that Borroughs would supply the Debtor with the aforesaid Shelving materials—the Bid is set forth in the Debtor's July 2, 1999 letter to Horsley, and at the top of page 2 of such letter the Debtor states that the Bid is based upon Borroughs supplying the materials in question. As well, and in any event, the Debtor reasonably relied upon a representation by Horsley to the effect that Borroughs would provide such materials, which representation came, at a minimum, by Horsley's acceptance of the Bid without any qualification (i.e., essentially by way of an omission).

4. Horsley contends that the Contract did not include a term that bound Horsley to ensure that its other subcontractors, namely Borroughs, would supply the Debtor with materials such that the same could be installed on a timely basis (i.e., "a buildable mix"). Horsley is correct. Nevertheless, applying California law, as set forth above, Horsley, as the primary contractor who was in control of the work being performed on the Tracy Job, became liable to the Debtor for any delay damages that the Debtor might incur as a result of delays caused by other of Horsley's subcontractors, such as, for instance, Borroughs. Such conclusion follows because the Contract did not include an express provision to the contrary.[5] Consequently, Horsley is liable for damages suffered by the Debtor due to the fact, and to the actual extent, that Borroughs did not provide the Debtor with a buildable mix.

5. Horsley contractually agreed that the Debtor would be provided with all necessary drawings regarding installation of the Shelving. Horsley contends that the Contract did not include a term whereby Horsley ensured the ac-

---

5. Horsley contends that California law provides that a primary contractor can be liable to its subcontractor for delay damages caused by other of such primary contractor's subcontractors only if such primary contractor engaged in active interference or was actively at fault. The Court disagrees with Horsley on such point and finds instead that California law does not require for such liability to exist that a primary contractor actively interfere or be actively at fault.

curacy of drawings made by its other subcontractors, namely Borroughs and Borroughs' subcontractors. The Court agrees that the Contract did not include such a term expressly. However, applying California law, as set forth above, Horsley impliedly warranted the accuracy of such drawings to the Debtor by seeing to it that the Debtor obtained such drawings from Borroughs, Horsley's subcontractor—such implied warranty *potentially* exposes Horsley to contractual liability. As well, to the extent that defects in such drawings led to delays that the Debtor suffered, Horsley became liable for attendant damages under the theory just discussed in the preceding paragraph.

6. Horsley, by accepting the Bid, agreed to all of the items upon which the Debtor based the Bid, namely those things set forth at the top of the first page of the Debtor's July 2, 1999 letter to Horsley, to wit that Horsley would provide "[f]ree and clear access to and from installation areas, free and clear work areas, sufficient staging areas for material set down, grade level access in and out of facility, access to docks with levelers for unloading, sufficient lighting and access to electrical hookups." As well, and in any event, the Debtor reasonably relied upon a representation by Horsley to the effect that it would provide the foregoing, which representation came, at a minimum, by Horsley's acceptance of the Bid without any qualification (i.e., essentially by way of an omission).

7. Horsley and the Debtor contractually agreed that the Debtor would complete his performance under the Contract in a period of three months. However, Horsley never made a guarantee, that is Horsley never represented, to the Debtor that the Debtor could complete his contractual performance in three months.

8. Of the 44 separate damage items (hereafter "Damage Item/s") that comprise the total damage figure of $258,635.94 that is set forth in the Debtor's Damage Summary, all but two (2) are items for which the Debtor, and thus now the Trustee, may, at least to some extent, *conceivably* recover under a breach of contract theory. For instance, Damage Items 1—3, 38, 40, and 41 seek recovery for an alleged failure by Horsley to provide those things upon which the Debtor based the Bid, which, as set forth in paragraph 6 above, Horsley agreed and represented that it would provide. Damage Items 4—23 and 39 seek recovery for an alleged failure by Borroughs to supply a buildable mix, for which failure, as set forth in paragraph 4 above, Horsley would need to answer. Damage Items 24—37 seek recovery for alleged deficiencies, inadequacies, errors, and/or omissions in the drawings that Borroughs provided or was supposed to provide to the Debtor, which, if proven, opens Horsley up to potential liability as explained in paragraph 5 above. From Damage Items 24—37 the Court excludes Damage Item 34 ("Flooring connection methods") as an item for which a conceivable recovery can be had— the Court so excludes such Damage Item for the reasons explained in a subsequent part of the instant opin-

ion. For reasons also set forth below, the Court excludes Damage Item 42 ("Excessive shimming required") as a Damage Item for which a conceivable recovery can be had. Damage Items 43 and 44 seek recovery for expenses allegedly incurred by the Debtor as a result of having to contend with the other alleged breaches set forth in Damage Items 1—42; the Court, for reasons set forth below, finds that a conceivable recovery cannot be had for a portion of Damage Items 43 and 44.

9. The Debtor actually incurred some portion of the various Damage Items just discussed in paragraph 8, and Horsley was actually at fault, that is Horsley is liable to the Debtor, and now the Trustee, for some portion of that portion of the Damage Items that were actually incurred by the Debtor.

In light of the nine foregoing findings/conclusions, the Debtor has established, to some extent, each of the four requirements for a contract breach action, namely (a)

existence of a contract, (b) performance by plaintiff, (c) defendant's breach, and (d) resulting damage to plaintiff.[6] Having held as much, the Court must now struggle with determining the extent to which the Debtor actually incurred damages, and to what extent Horsley actually caused or is liable for the same.

### A. The Court's difficulty with the total damage figures sought by the Trustee (i.e., $258,635.94 or $336,000).

At the outset, the Court holds that the Trustee has not preponderantly proven that the Debtor actually incurred the $258,635.94 in total damages that are set forth in the Debtor's Damage Summary, and that is regardless of whether such damages were caused by Horsley or the Debtor himself. Put differently, the Court holds that the maximum amount of damages that the Debtor could have incurred, even if the Debtor also caused such damages himself, equals a figure that is far less than $258,635.94. The Court so holds for several reasons.

---

**6.** The Court notes that it possesses at least some reservations as to whether (a) the Contract is one that is founded upon an instrument of writing for purposes of California statute of limitations law, particularly given that, as the Trustee concedes in her first post-trial brief, the Contract is based, at least in part, upon "oral representations made by the Horsley Company," Tr. 2/23/05 Br. (Doc. No. 59), at p. 2, and (b) the Trustee's contract breach cause of action, based as it is upon the Contract, is consequently time barred by California's two-year statute of limitations contained in Cal.Code § 339(1), particularly given that

[t]he courts have been equally consistent in their position that[,] to bring the four-year limitations period [of Cal.Code § 337(1)] into play[,] "it is not sufficient that the cause of action is in some way remotely or indirectly connected with such an instrument or that the instrument is a link in the

chain establishing the cause of action, but the instrument must, itself, contain a contract to do the thing for the nonperformance of which the action is brought."

*Valerio v. Boise Cascade Corp.,* 80 F.R.D. 626, 632 (N.D.Cal.1978). The foregoing reservations notwithstanding, the Court holds that (a) the Contract is one that is founded upon an instrument of writing for purposes of California limitations period law, and (b) the Trustee's contract breach cause of action is thus not time barred by Cal.Code § 339(1). The Court so holds, albeit gingerly, because, as set forth above, Horsley, by virtue of accepting the Bid, implicitly agreed to many terms that the Debtor himself wrote into the Bid, which written terms (a) are thus found by the Court to constitute a part of the Contract, and (b) would appear to largely comprise the substance of the aforesaid oral representations by Horsley that are referred to by the Trustee in her post-trial brief.

First, the Debtor's Damage Summary includes an overhead charge for $23,512.36, which charge is calculated by multiplying by 0.10 the sum of all other damage items contained in such summary, or $235,123.58. The Court observes that the $235,123.58 summary figure includes what the Debtor contends is an appropriate markup or profit that he should obtain on the extra expenses that he sets forth in the Debtor's Damage Summary; therefore, the aforesaid overhead charge is a flat 10% of not only alleged extra expenses incurred by the Debtor but also profit to be earned thereon. The Court holds comfortably that not only has the Trustee not preponderantly proven that the Debtor is entitled to such a recovery for overhead but also that the Debtor himself is aware that such a charge is inappropriate. Although the Debtor testified that such an overhead charge is consistent with industry practice, the Court identifies at least three reasons why such point has not been preponderantly established, namely (a) because the Debtor failed to substantiate such testimony, (b) because the Debtor failed to sufficiently demonstrate that the industry standard regarding overhead, whatever it might be, is consistent among all businesses within the industry (i.e., it is the same regardless of business size, geographic location, etc.), and (c) because the Court finds it to not be credible that the industry standard regarding overhead is a flat 10% charge calculated not only on total expenses incurred *but also on profit to be earned thereon.* More problematical, the Court finds, is the Debtor's testimony that such overhead charge represents for himself nothing other than a means to recover some reimbursement for the use of his office and office equipment located at his personal residence in Pittsburgh during the duration of his performance under the Contract. The Court is troubled by such testimony because, quite simply, the Court does not find it to be credible that the Debtor actually utilized such home office and office equipment to the extent of $23,512.36 during the duration of the Debtor's performance under the Contract. Indeed, the Court even questions whether such home office/equipment existed, or that the Debtor actually generated labor hours from his home relative to the Contract, given that, when the Debtor completed his Bankruptcy Schedule B just several years subsequent to the completion of his performance under the Contract, he failed to list in such schedule even one item of home office equipment although he listed a page worth of business machinery/equipment. In light of the foregoing, the Court (a) finds to be not only wildly speculative but downright exorbitant a $23,512.36 overhead charge, as well as a flat overhead rate of 10% utilized as it was by the Debtor with respect to the Contract, (b) finds that the Debtor was aware when he testified at trial, as well as when he composed the Debtor's Damage Summary, that such overhead was unreasonable, indeed inappropriate, and (c) finds that an appropriate overhead charge for the Debtor relative to the Contract is but 1%, which rate is to be applied only to the total of expenses (other than overhead) determined prior to an allowance for profit/markup.

Second, the Court identifies a substantial discrepancy between the Debtor's Damage Summary and the Expense Report vis-a-vis the total damages that the Debtor could have incurred under the Contract. The Debtor, who authored both the Debtor's Damage Summary and the Expense Report, testified that the substance of each document is accurate. Yet, the Expense Report reveals that the Debtor's loss on the Contract, without consideration for overhead expense and his home office labor, equals $49,452.14. Because the Ex-

pense Report, as the Debtor testified, does not contain any allowance for a profit that would be derived from the Contract, and since, as set forth in the immediately preceding paragraph herein, each of the Damage Items contained in the Debtor's Damage Summary save that for overhead (i.e., $235,123.58 worth of Damage Items) include what the Debtor contends is an appropriate markup or profit that he should obtain on such Damage Items, the Court, so that it may properly compare the two documents, shall import a reasonable profit allowance into the Expense Report. Such profit to be so imported is set equal to $84,577.36, which amount equals 21.74 percent—i.e., that percentage which is calculated by dividing the profit that the Debtor testified he originally anticipated to earn on the Contract by the total costs that the Debtor originally expected to expend under the Contract (i.e., $60,000 divided by $276,000)—of $389,040.30, which latter figure is that set forth in the Expense Report as the total expenses that the Debtor actually incurred in performing under the Contract, save for overhead and his home office labor.[7] Adding together $49,452.14 and $84,577.36 yields a sum of $134,029.50, which amount represents the total damages, that is out-of-pocket loss plus lost profit at a markup rate of 21.74%, that the Debtor incurred according to the

Expense Report, save for an amount for his overhead and home office labor. In comparison, the Debtor's Damage Summary reveals that he allegedly incurred $235,123.58 in damages other than a charge for overhead. What could be the explanation for the discrepancy of $101,094.08 between the two figures gleaned from the two documents in question (i.e., $235,123.58 less $134,029.50)?

Could the explanation for the aforesaid $101,094.08 discrepancy be an allowance for the alleged cost of the Debtor's home office labor plus profit thereon, which cost the Debtor testified is not included in the Expense Report?[8] Perhaps, but only if an allowance for such alleged cost is included in the Debtor's Damage Summary. The Court is uncertain whether an allowance for such alleged cost is so included; however, the Court concludes, after examining each of the 44 separate Damage Items in the Debtor's Damage Summary, that, if such an allowance is so included, then the most that such allowance could equal is $9,625, or the sum of Damage Items 36 and 37.[9] Because $9,625 is a far cry from $101,094.08, something else must be at the root of such discrepancy. The Court identifies as the likely cause of such discrepancy the exorbitant rates at which the Debtor seeks to recover damages for alleged

7. Calculating a profit allowance to import into the Expense Report by multiplying .2174 by a cost figure that does not contain overhead is appropriate for relevant comparison purposes given that, as set forth above, the Debtor calculated overhead in the Debtor's Damage Summary by multiplying 0.10 by an amount that consists of both extra costs and a markup or profit allowance; in other words, the Debtor computed overhead in the Debtor's Damage Summary after first arriving at a profit figure, so such profit necessarily did not take into account any charge for overhead.

8. See footnote 1 above, wherein the Court points out that it may disregard for comparison purposes a couple of other costs that the

Debtor contends are not contained within the Expense Report.

9. Damage Items 36 and 37 are each comprised of a recovery for supervisory time at $55/hour, and total, between the two of them, a recovery for 175 hours of supervisory time—i.e., $175 \times \$55 = \$9,625$. The descriptions given to such damage items by the Debtor are, respectively, "GS product reengineering" (Damage Item 36) and "Re-engineering of floor layout" (Damage Item 37), which descriptions would indicate work that perhaps conceivably could have been done by the Debtor away from the Tracy Job site.

extra labor hours that he incurred in finishing his performance under the Contract. In particular, the Debtor contends, as set forth in the Debtor's Damage Summary and via his own testimony, that he incurred additional non-supervisory labor hours of 6,408, and that he should be able to recover for the same at a rate of $30/hour.[10] However, the Debtor also testified that (a) he utilized substantially the services of temporary laborers, and that he paid such temporary labor roughly $13/hour, and (b) the blended rates that were actually paid by the Debtor for any of the labor utilized on the Tracy Job project equalled between $11.73/hour (that paid for Kelly) and $20.59/hour (that paid for NSS, that is the Debtor). A recovery on such labor of $30/hour if the Debtor himself paid but (a) $13/hour yields a markup of 130.77%, (b) $11.73/hour yields a markup of 155.75%, or (c) $20.59/hour yields a markup of 45.70%. Are such markups of between 45.70% and 155.75% appropriate (a) when the Debtor projected a markup on his anticipated total costs on the Tracy Job project of but 21.74%, and (b) in light of the Debtor's own testimony that he was aware that Borroughs, another apparent member in the same industry as the Debtor, regularly marked up its labor costs by but only 20%? The Court concludes not only that such markups are exorbitant and, thus, inappropriate but also that, given the degree of such exorbitance, such markups were known by the Debtor to be excessive and inappropriate when the Debtor testified at trial and when he composed the

Debtor's Damage Summary. The Court also points out that, if the Debtor, for instance, paid the lion's share of the alleged 6,408 labor hours at $13/hour, and if the $13/hour is marked up by 21.74%—which markup would be reasonable given that such is the rate at which the Debtor marked up his anticipated expenses on the Tracy Job project—to $15.83, then the recovery that is sought by the Debtor regarding such 6,408 hours would be excessive by $90,801 (i.e., $30—$15.83, or $14.17, multiplied by 6,408); $90,801 is fairly close to the $101,094.08 discrepancy that the Court determines to exist between the Debtor's Damage Summary and the Expense Report vis-a-vis the total damages that the Debtor could have incurred under the Contract.

 Because of the aforesaid $101,094.08 discrepancy between the Debtor's Damage Summary and the Expense Report vis-a-vis total damages, and since such discrepancy appears to be largely explained by the Debtor's attempt to recover an inappropriate markup/profit under the Contract, the Court finds that the Debtor could not have incurred damages under the Contract, excepting for an amount for overhead and home office labor, in excess of $134,029.50, which amount, as set forth above, represents the total damages, that is out-of-pocket loss plus lost profit (lost profit at what the Court finds to be a reasonable and appropriate rate of 21.74%),[11] that the Debtor incurred according to the Expense Report,

10. The recovery for such labor at $30/hour equals $192,240 (i.e., 6,408 hours × $30/hour), which recovery represents the lion's share of the $235,123.58 in damages sans overhead set forth in the Debtor's Damage Summary.

11. The Court finds that to calculate lost profit for the Debtor at a markup percentage of 21.74% is reasonable not only because, as

explained above, such was the markup rate that he projected to earn on the Tracy Job project, but also because the Debtor offered absolutely no evidence that he would have earned any greater of a profit percentage on any other job had he not had to work the roughly three additional months that he needed to work to complete his performance under the Contract.

save for an amount for his overhead and home office labor. The Court also feels compelled to accept as an outside limit on the damages that the Debtor could have incurred under the Contract the foregoing figure, derived as it is from the Expense Report, given that the Debtor's Damage Summary was composed by the Debtor some three to four years subsequent to the completion of the Contract, and in preparation for the instant trial, whereas the Expense Report was prepared by the Debtor relatively shortly after he completed his contractual performance.

As for the Trustee's position that the Debtor is actually entitled to delay damages in the amount of $336,000 rather than $258,635.94, the Court must reject such position if for no other reason than that it has already determined that (a) a recovery of the lesser figure of $258,635.94 is unwarranted, and (b) the outside limit for a recovery by the Trustee on its contract breach action is $134,029.50 plus an appropriate recovery for overhead and home office labor. Although the preceding rationale of the Court is more than sufficient to dispose of the Trustee's position for a $336,000 recovery, the Court observes that such position appears to be based upon presumptions that (a) the Debtor had been guaranteed by Horsley that the Contract would be completed within 12 weeks, and (b) the gist of the Contract was that the Debtor merely needed to perform thereunder for 12 weeks in return for consideration of $336,000, not that he needed to complete installation of the Shelving. Both presumptions, the Court finds, are totally erroneous—as set forth earlier in the instant opinion, Horsley did not provide the Debtor with any such guarantee notwithstanding that contract completion within 12 weeks was made a term of the Contract, and the Contract called for the Debtor to complete installation of the Shelving, not merely that the Debtor show up and provide services for a fixed period of time regardless of whether such completion were to occur.

### B. *Damage Items for which a recovery cannot be obtained.*

#### (i) *Damage Item 34—Excess costs to attach the Shelving flooring.*

■ The Court concludes that the Debtor, and now the Trustee, cannot recover for Damage Item 34, which item represents the extra labor costs (plus accompanying markup) that the Debtor allegedly incurred to address the issue of having to attach the flooring for the Shelving from the bottom up rather than from the top down. As the Court understands it, the basis for the Trustee's position that Horsley should have to answer for the alleged extra costs that were incurred by the Debtor to attach the flooring for the Shelving is that (a) the Debtor did not receive any drawing from Horsley (or Borroughs, Horsley's subcontractor) when the Contract was signed regarding such flooring attachment, and (b) Borroughs, because it allegedly was Horsley's agent and because it also supposedly promised the Debtor that the Debtor would be reimbursed for any extra costs that the Debtor might incur in having to attach the Shelving flooring from the bottom up rather than from the top down, thereby bound Horsley to answer for such promise to the Debtor.

That the Debtor apparently did not receive a drawing from Horsley (or Borroughs, Horsley's subcontractor) when the Contract was signed regarding the aforesaid flooring attachment cannot operate to obligate Horsley to pay for increased costs associated with such flooring attachment, the Court holds, because, and as the Debtor testified, he submitted the Bid to Horsley while he was at the same time fully

cognizant of the fact that he did not then know how the Shelving flooring would be attached.[12] Because the Debtor was aware when he made the Bid that he based the same upon incomplete information, or an omission in, or lack of, a relevant drawing, the Debtor could not reasonably have relied either upon (a) the information or drawings that were furnished to him as the same impact upon the issue of attachment of the Shelving flooring, or (b) some implied representation that Horsley perhaps might be found to have made by virtue of omitting to tell Horsley about such installation issue. The foregoing dictates a conclusion that Horsley is neither liable for any breach of an implied warranty as to the correctness of such information/drawings vis-a-vis such flooring attachment nor liable upon some sort of misrepresentation theory.[13] The Court also finds that, when such flooring attachment was conducted by the Debtor months later after the Shelving installation project was underway, the Debtor was then supplied with sufficient supplemental information by Borroughs, Horsley's subcontractor, such that the Debtor did not suffer any delay caused by Borroughs (or any other subcontractor of Horsley) while attaching such flooring (other than, of course, the delay which the Debtor was aware would occur when the flooring needed to be attached, which delay the Debtor was put on notice of prior to the commencement of the Shelving installation project and for which the Debtor consequently may not now recover).

■ As for the Debtor's belief, and the Trustee's contention, that Borroughs was Horsley's agent, and that Borroughs thus bound Horsley when it promised to reimburse the Debtor for any increased costs that the Debtor might incur when attaching the Shelving flooring, the Court (a) holds that such belief by the Debtor was mistaken, and (b) rejects outright such position by the Trustee. The Court so rules for several reasons. First, the Court does not even understand the Debtor's belief (as evidenced by his testimony), or the Trustee's position, to be that Borroughs was actually the agent of Horsley. Rather, the Court understands the argument to be that Borroughs was the ostensible, that is apparent, agent of Horsley, and thus so bound Horsley to representations that Borroughs made to the Debtor. Unfortunately for the Debtor, and now the Trustee, such ostensible (i.e., apparent) authority position fails because (a) the law, as set forth above, is that an ostensible agency arises not by virtue of what, in this case, was said or done by Borroughs, but rather what, in this case, was said or done

12. Indeed, the Debtor testified that he did not even discover how the Shelving flooring was to be attached until he met with Borroughs officials in Kalamazoo, Michigan on July 15, 1999, which date is nearly two weeks subsequent to July 2, 1999, when the Debtor submitted the Bid to Horsley.

13. The Court also queries whether or not the Debtor could have amended the Bid after he learned on July 15, 1999, that the attachment of the Shelving flooring would be more expensive than he had originally anticipated. The genesis of such query by the Court is the fact that the Purchase Order, which was mailed by Horsley on July 9, 1999, and which was not even received by the Debtor until July 14, 1999, contains language that would appear to have allowed the Debtor to amend the Bid if he so wished—in particular, the following language appears in the bottom left-hand corner of the Purchase Order: "NOTE: It is requested that you acknowledge this order IMMEDIATELY giving following information: ... (3) *Any changes in price or specification necessary.*" (emphasis added). If, in fact, the Debtor legally had the opportunity to amend the Bid on July 15, 1999, and he failed to do so in spite of what he learned regarding how the Shelving flooring was to be attached, then such failure by the Debtor also frees Horsley from any liability for a potential breach of the aforesaid warranty of correctness.

by Horsley, and (b) the trial record is bereft of sufficient, indeed any, evidence that would support a finding that Horsley said or did anything, or exercised a lack of ordinary care so as, to engender in the Debtor (or, for that matter, anyone else) a belief that Borroughs was somehow the agent for Horsley.

Consequently, the Debtor, and now the Trustee, cannot recover for Damage Item 34. Therefore, the Court, in order to arrive at an outside limit on the amount of contract breach damages that may be recovered by the Trustee, shall deduct from $134,029.50 those costs that are contained in the Expense Report that pertain to Damage Item 34, plus imported profit attributable thereto. What amount should be so subtracted? The Debtor's Damage Summary indicates that 2,067 hours were expended to address Damage Item 34, and so the Court shall multiply 2,067 hours by a rate to arrive at the amount that shall be so subtracted. Rather than using what the Court, as set forth above, found to be an inflated rate of $30/hour, which rate is that which is utilized in the Debtor's Damage Summary, the Court shall utilize a rate of $15/hour, which rate represents a rough midpoint of the various blended rates which were paid by the Debtor for labor on the Tracy Job project; the Court must also adjust the $15/hour rate to take into account the imported profit at a markup rate of 21.74% that is built into the $134,029.50 figure. Such calculation yields an amount to subtract of $37,745.49—i.e., 2,067 hrs. × $15/hr. × 1.2174.

### (ii) *Damage Item 42—Costs to address uneven warehouse floor.*

■ The Court concludes that the Debtor, and now the Trustee, cannot recover for Damage Item 42, which item represents the labor costs (plus accompanying markup) that the Debtor allegedly incurred to address the issue of an uneven warehouse floor upon which the Shelving was to be installed—i.e., the time spent having to install shims. The Court is even frankly uncertain as to the basis for the Trustee's position that a contract breach recovery may be obtained for such labor costs, especially given that

(a) the Debtor did not base the Bid upon a presumption that the warehouse floor would be even—because such bid was not based upon such a presumption that was then conveyed to Horsley, Horsley could not, by omission, somehow have represented that such floor would be even;

(b) Horsley never represented to the Debtor that such floor would be even—because of a lack of such representation, Horsley obviously cannot be held to have made an affirmative misrepresentation for which it must now answer;

(c) the Debtor did nothing in the way of due diligence prior to submitting the Bid to ascertain the levelness of such floor—such failure would make unreasonable any reliance by the Debtor upon any misrepresentation that Horsley might be found to have made; and

(d) Horsley, in fact, and as the Debtor conceded at trial, affirmatively informed the Debtor that the warehouse floor was uneven and that nothing could be done to rectify the situation. Because the Debtor was so informed by Horsley at the site visit which occurred on July 7—8, and because such time is prior to when (i) the Purchase Order was drafted, let alone received by the Debtor, and thus (ii) the Contract could have arose, the Debtor re-

ceived notice as to such uneven floor problem at a time when he could have rectified even a mistaken but nevertheless justified presumption that he had (i.e., by amending the Bid accordingly)—consequently, even if the Debtor, prior to July 7—8, might have been able to reasonably rely upon a misrepresentation that Horsley might have been found to have made, the Debtor could not do so subsequent to July 7—8.

In light of all of the foregoing, the Debtor, and now the Trustee, cannot recover for Damage Item 42. Therefore, the Court, in order to arrive at an outside limit on the amount of contract breach damages that may be recovered by the Trustee, shall deduct from $134,029.50 those costs that are contained in the Expense Report that pertain to Damage Item 42, plus imported profit attributable thereto. What amount should be so subtracted? The Debtor's Damage Summary indicates that 160 hours were expended to address Damage Item 42, and so the Court shall multiply 160 hours by the $15/hour rate utilized, as set forth above, to adjust for Damage Item 34; of course, as was the case when dealing with Damage Item 34, the Court must then adjust such product to take into account the imported profit at a markup rate of 21.74% that is built into the $134,029.50 figure. Such calculation yields an amount to subtract of $2,921.76—i.e., 160 hrs. × $15/hr. × 1.2174.

### (iii) *Damage Item 43—$27,143.58 worth of miscellaneous expenses.*

Because the Court disallows a recovery for Damage Items 34 and 42, the Court finds that it must also disallow a recovery for some portion of Damage Item 43, which item represents miscellaneous additional expenses allegedly incurred by the Debtor to complete his performance under the Contract, such as extended per diem expenses, travel expenses, temporary housing costs, etc. The Court finds, after a quite complicated calculation which is set forth in the margin, that the appropriate amount to disallow equals $13,307.06.[14]

### C. *The maximum amount of damages that the Debtor could have incurred (i.e., an outside limit on damages that are recoverable by the Trustee).*

In light of all of the foregoing, the Court holds that the most that the Debtor could have incurred in the way of damages, whether they be of his own making or the fault of Horsley, equals $80,055.19, plus an amount for overhead and home office labor—i.e., $134,029.50 (*see* pt. A)—$37,745.49 (*see* pt. B(i))—$2,921.76 (*see* pt. B(ii))—$13,307.06 (*see* pt. B(iii)). As for overhead, the Court holds, as set forth above, that the most that the Debtor could recover for overhead equals 1% of the total of expenses (other than overhead) determined prior to an allowance for profit/markup. The total expense figure to which the 1% rate should be applied equals $344,704.58, the calculation for which is set

---

**14.** (1) $27,143.58 (DI 43 w/o profit) × 1.2174 (markup rate built into $134,029.50 figure) = $33,044.59 (DI 43 w/ profit);

(2) $134,029.50 (Outside Limit on Damages)—$33,044.59 (DI 43) = $100,984.91 (Outside Limit w/o DI 43);

(3) $37,745.49 (DI 34) + $2,921.76 (DI 42) = $40,667.25 (DI 34 + DI 42);

(4) $40,667.25 (DI 34 + DI 42) / $100,984.91 (Outside Limit w/o DI 43) = .4027, or 40.27% (% of Outside Limit w/o DI 43 that is composed of DI 34 & DI 42—this is the % of DI 43 w/ profit that should be disallowed);

(5) .4027 (% arrived at on preceding line 4—i.e., the % of DI 43 w/ profit that should be disallowed) × $33,044.59 (DI 43 w/ profit) = **$13,307.06** (portion of DI 43 w/ profit that should be disallowed and, thus, subtracted from $134,029.50 figure).

forth in the margin.[15] Multiplying $344,704.58 by 0.01 yields a maximum overhead allowance of $3,447.05; adding a profit at 21.74% to this figure yields $4,196.44. Regarding home office labor of the Debtor, the Court concludes that any allowance for the same should be subsumed in the $4,196.44 overhead figure given, as explained above, the utter lack of proof by the Trustee that the Debtor even maintained a home office and office equipment, let alone that the Debtor actually generated labor hours from his home relative to the Contract. Consequently, the outside limit on contract breach damages that are recoverable by the Trustee in the instant matter is $84,251.63—i.e., $80,055.19 + $4,196.44.

### D. *What portion of the $84,251.63 worth of conceivable damages was caused by Horsley?*

▆ As an initial matter, the Court notes that, after having gone through the foregoing analysis, it is obviously much more comfortable with the proposition that the Debtor actually incurred $84,251.63 of damages than with the proposition that the Debtor incurred damages of either $258,635.94 or $336,000. That said, the Court nevertheless doubts that the Trustee has even preponderantly proven that the Debtor incurred damages that approach $84,251.63 in amount, and that is regardless of whether such damages were caused by Horsley or the Debtor himself. In fact, the Court is only comfortable in holding, as it essentially held in a much

earlier part of the instant opinion, that the Debtor actually incurred some amount of damages—unknown, as it turns out—while performing under the Contract (i.e., the Debtor incurred some unknown portion of the various Damage Items contained in the Debtor's Damage Summary). The foregoing holding, the Court notes, is not fatal to a recovery by the Trustee of some amount of damages since, given California law regarding damages, a recovery of damages may be awarded even if there is relative uncertainty as to the amount thereof provided there is no uncertainty as to the fact of such damages, that is, as to their nature, existence, or *cause.* The obstacle that remains to some sort of recovery by the Trustee in the instant matter, the Court determines, is whether the Trustee has preponderantly proven that Horsley, rather than the Debtor himself, caused any particular item of damage, that is any particular Damage Item as set forth in the Debtor's Damage Summary, so that the Court may then proceed to ascertain a dollar amount to affix to such particular damage item.

The Debtor testified that Horsley was at fault for 100% of the damages that the Trustee seeks to recover via the Trustee's contract breach action. Has the Trustee preponderantly proven such proposition, however? Absolutely not, holds the Court. The Court so holds because (a) the lone proof that the Trustee offered at trial for such proposition is the Debtor's self-serving testimony to such effect, which testimony is entirely uncorroborated, and (b)

**15.** (1) Take $389,040.30, which is the total expense figure in the Expense Report (which figure, as set forth above, does not include any allowance for profit);
(2) Subtract from $389,040.30 the sum of costs attributable to Damage Items 34, 42, and 43 for which a recovery may not be had (which sum shall be sans an allowance for profit);

(3) The sum of costs attributable to DI 34, 42, and 43 to be so subtracted equals $53,974.31 (i.e., $37,745.49 + $2,921.76 + $13,307.06). The 21.74% markup built into the $53,974.31 figure is excised by dividing $53,974.31 by 1.2174, which yields $44,335.72;
(4) $389,040.30—$44,335.72 = **$344,704.58.**

the Court, for several reasons, finds such testimony by the Debtor to be unreliable and, in any event, of insufficient weight such that it can serve to carry the Trustee's burden of proof on such point by the necessary preponderance of the evidence. The reasons to which the Court refers in the previous sentence are set forth below, and none of them, the Court notes, depend in any way upon any portion of the deposition testimony that was offered into evidence by Horsley after the conclusion of the Trustee's case at trial:

(a) The Court's conclusion, as set forth above, that the Debtor was not truthful when he testified as to the reasonableness and propriety of (i) the overhead charge and labor markups that he now seeks as damages, and (ii) the overall amount of damages, therefore, that he now seeks—the Court sees no reason why it should believe the Debtor's testimony regarding who caused particular damages if the Court cannot accept as true the foregoing testimony re-

garding extent, indeed the very existence, of such damages;

(b) The fact that the Debtor will share in a recovery by the Trustee on her contract breach action if such recovery is sufficiently high enough to first satisfy the Debtor's unsecured creditors and the Trustee's fees, coupled with the fact that the Debtor had reason to believe, when he testified, that if such recovery reaches approximately $173,778.62,[16] then he would begin to share in such recovery—the foregoing establishes motive by the Debtor in attempting to increase the amount of a recovery such as by, for instance, blaming Horsley for the entirety of the damages that he alleges he incurred, which motive the Court must consider given that the Debtor was the lone witness who testified in support of the Trustee's case;

(c) The apparent state of the Debtor's financial affairs when the trial was held, as evidenced by the Debtor's

16. The calculation to arrive at the $173,778.62 figure is somewhat complex, but is set forth as follows:

(1) Recovery + Prejudgment Interest on Recovery = Unsecured Debt + Interest on Unsecured Debt + Trustee's Fees + Trustee's Counsel's Contingent Fee. Solving this equation for the Recovery will establish the amount of the recovery that is necessary before the Debtor shares therein. Recovery in the equation is set equal to Y.

(2) Prejudgment Interest on Recovery = 5 (the no. of yrs. for which the Debtor thought he was entitled to such interest (i.e., 2/00—1/05)) × .06 (6% is prejudgment interest rate, as set forth below) × Recovery (Y). Summarized, prejudgment interest = $5 \times .06 \times Y = .30Y$.

(3) Unsecured Debt = $130,230.24.

(4) Interest on Unsecured Debt (must be paid before Debtor gets recovery, per 11 U.S.C. § 726(a)(5)) = $130,230.24 × .06 (interest rate) × 2 (approximate no. of yrs. from petition filing date to date of trial—this is period

for which Debtor would have projected interest needed to be paid creditors). $130,230.24 × .06 × 2 = $15,627.63.

(5) Unsecured Debt + Interest Thereon = $145,857.87 (i.e., $130,230.24 + $15,627.63).

(6) Trustee's Fee (as established by 11 U.S.C. § 326(a)) = [.25 × $5,000] + [.10 × $45,000] + [.05 × ($145,857.87—$50,000)] = $10,542.89.

(7) Trustee's Counsel's Contingent Fee = .40 (Contingent Fee %) × Recovery (Y). Summarized, counsel's fee = .40Y.

(8) Equation in line 1 now reads as follows: Y + .30Y = $130,230.24 + $15,627.63 + $10,542.89 + .40Y.

(9) Solving for Y yields an amount of $173,778.62, and is done as follows:

(i) Y + .3Y = $130,230.24 + $15,627.63 + $10,542.89 + .4Y

(ii) 1.3Y = $156,400.76 + .4Y

(iii) 0.9Y = $156,400.76

(iv) Y = $156,400.76 / 0.9

(v) Y = $173,778.62

Bankruptcy Schedules I and J, which schedules (i) show that the Debtor presently earns $1,274.56 on a net monthly basis, and incurs monthly expenses of $2,549.00, and (ii) establish that the Debtor needs to receive a portion of the recovery from the Trustee's contract breach action—once again, motive is a very relevant consideration for the Court;

(d) The Debtor's belief that the damages that he allegedly sustained as a result of Horsley's alleged breach of the Contract are what forced him into bankruptcy—once again, motive is relevant; and

(e) The fact that, on March 2, 2004, Horsley filed a proof of claim in the Debtor's bankruptcy case for $56,539.50, which claim represents, according to the exhibit attached to such proof, "Expenses Incurred and Back Charged to National Storage" Systems by Horsley regarding work done by the Debtor on the Tracy Job—such proof of claim constitutes some evidence that the Debtor was partly at fault for damages that he incurred while working pursuant to the Contract.

Because the Trustee fails to preponderantly prove that Horsley caused 100% of the damages that are sought by the Trustee in her contract breach cause of action, and since, as the Court finds, the Trustee offered little, indeed nothing, to the Court at trial that could now perhaps be used by the Court in an attempt to apportion between the Debtor and Horsley fault for some particular item or items of damage, what is the Court to do? The resolution of such dilemma is made even more difficult by the Court's earlier holding, as set forth above, that Horsley was actually at fault for some portion of that portion of the Damage Items that were actually incurred

by the Debtor. Can the Court simply make a wild guess as to the fault percentage that should be attributed to Horsley for each item of damage that was, or for the total amount of damages that were, incurred by the Debtor? Of course not, particularly given that (a) the Court, pursuant to California law as set forth above, cannot even just simply register a wild guess when attempting to ascertain an amount of damages to award (instead, some reasonable basis of computation must be used), and (b) the issue of causation, or fault, regarding damages goes to the fact of such damages, which latter point, as California law provides, must be preponderantly proven to a certainty, or at least to a far greater certainty than that which is required with respect to the amount of such damages. Therefore, the Court must search the trial record in the instant matter for evidence that will allow it to assess, with the requisite amount of certainty, the degree to which Horsley was at fault for damages that were sustained by the Debtor.

The Court identifies but one item of record evidence which the Court can so use to assess the degree of Horsley's aforesaid fault, namely Horsley's Settlement Letter, which letter constitutes Horsley's Exhibit K in the instant adversary proceeding. Horsley's Settlement Letter, dated April 5, 2000, and sent to the Debtor, (a) documents Horsley's offer to the Debtor to settle then what now constitute the Trustee's claims against Horsley for a total payment by Horsley to the Debtor of $15,022, (b) indicates that Horsley had, prior to such settlement offer, settled with Borroughs for mistakes or delays caused by Borroughs, and (c) represents that the proceeds of such settlement with Borroughs were included in the $15,022 offer. Horsley's Settlement Letter constitutes *some evidence* that (a) Borroughs, Horsley's subcontractor, was at

fault for some of the damages that were suffered by the Debtor, for which damages Horsley is answerable, and (b) Horsley was at fault for some of the damages that were suffered by the Debtor to the extent of $15,022. Because Horsley's Settlement Letter constitutes some evidence of the foregoing, and since the Court independently determines—that is, by way of the case that the Trustee put on at trial—that Horsley was actually at fault for some portion of that portion of the Damage Items that were actually incurred by the Debtor, the Court can and, thus, does find (i.e., it has been preponderantly proven) that Horsley caused $15,022 worth of damages to the Debtor.

■ The Court notes that it is not exactly enamored by the idea of having to use as a decisive piece of evidence in the instant matter the offer of one party to another to settle a claim. However, Horsley, of course, cannot object to such use of its settlement offer by the Court given that Horsley itself introduced Horsley's Settlement Letter into evidence. *See Southern Railway Co. v. H.W. Vaughn*, 359 F.2d 424, 425 (5th Cir.1966) (one who introduces at trial evidence of a settlement of a claim cannot later object to the use of such evidence); *Shafer v. Bedard*, 761 S.W.2d 126, 130 (Tex.App.1988) (one who introduces at trial evidence of a compromise offer waives any objection to its subsequent use). As for the Trustee's objection at trial to the admission into evidence of Horsley's Settlement Letter pursuant to Fed.R.Evid. 408, the Court overrules such objection for at least two reasons. First, Rule 408, as a matter of law, does not preclude the admission into evidence of a settlement offer when the settlement offeror (i.e., author of a settlement proposal) is the same party that is attempting to gain the admission of such settlement offer. *See Crues v. KFC Corp.*, 768 F.2d 230,

233–34 (8th Cir.1985) ("no federal cases [cited] holding that Rule 408 applies to admissions of compromise against the offeree. The rule is concerned with excluding proof of compromise to show liability of the offeror"); *Morley–Murphy Co. v. Zenith Electronics Corp.*, 910 F.Supp. 450, 456 (W.D.Wis.1996) (same); *Vafaie v. Owens*, 1996 WL 502133 at *8 (Tenn.Ct.App. 1996) (same). Thus, because Horsley is the author of Horsley's Settlement Letter, and since Horsley is the one who offered such letter into evidence, the Trustee may not successfully object to its admission into evidence on the basis of Rule 408. Second, and more importantly, the Trustee is not prejudiced—and, in fact, benefits—by the Court's use of Horsley's Settlement Letter so as to assess the degree of Horsley's fault with respect to damages that were incurred by the Debtor given that, without such usage, the Trustee fails to preponderantly prove requisite causation vis-a-vis the Debtor's damages, which failure is fatal to the Trustee's contract breach action. Therefore, the Court relies on Horsley's Settlement Letter to establish that Horsley caused $15,022 worth of damages to the Debtor.

### E. *The amount of damages that will be awarded to the Trustee on her contract breach action.*

The Court determines that the Trustee is entitled to the following damages on her contract breach cause of action:

(1) $15,022—Taken from Horsley's Settlement Letter (awarded entirely in place of amounts listed in the Debtor's Damage Summary, except Damage Items 43 ($27,143.58 Miscellaneous Expenses) and 44 (Overhead)); the Court finds that the $15,022 figure is largely devoid of any allowance for profit.

(2) $4,916 [17]—Portion of Damage Item 43 ($27,143.58 Miscellaneous Expenses) for which a recovery is allowed (the Court finds that such expenses were actually incurred); $4,916 figure does not contain profit allowance.

(3) $199—Overhead allowance at 1% of the sum of $15,022 + $4,916; no profit included in $199 figure.

(4) $4,378—Profit = 21.74% of the sum of $15,022, $4,916, and $199; i.e., .2174 × ($15,022 + $4,916 + $199).

Adding the four items of damages together yields $24,515; this is the total amount of damages that the Court will award to the Trustee on her contract breach cause of action, exclusive of appropriate prejudgment interest.

### F. *Prejudgment Interest on the $24,515 damages award.*

 As an initial matter, should the issue of prejudgment interest be decided by reference to federal law or by reference to state law, and if such issue is resolvable by reference to state law, then which state's law so applies (i.e., California or Pennsylvania)? The Court holds that state rather than federal law applies in resolving issues regarding prejudgment interest, and that—much as was the case when determining choice of law issues regarding the merits of the Trustee's causes of action—Pennsylvania's choice of law rules must be consulted to determine, as between the law of Pennsylvania or that of California, which one shall apply to resolve prejudgment interest issues in the instant matter. *See Simmons v. Allstate Insurance Co.*, 1997 WL 430997 at *1 (E.D.Pa. 1997); *Optopics Laboratories Corp. v. Nicholas,* 1997 WL 602750 at *14 (E.D.Pa. 1997); *Ross v. Celotex Corp.*, 1989 WL 106957 at *1 (E.D.Pa.1989). Pennsylvania's choice of law rule regarding prejudgment interest is "that Pennsylvania law shall 'determine the amount and availability of pre-judgment interest in all cases brought in a Pennsylvania forum.'" *Optopics Laboratories,* 1997 WL 602750 at *14 (quoting *Yohannon v. Keene Corp.*, 924 F.2d 1255, 1267 (3rd Cir.1991)); *see also Simmons,* 1997 WL 430997 at *1 (same, also relying on *Yohannon*). The preceding rule follows because, as "the Third Circuit held [in *Yohannon,*] . . . the Supreme Court of Pennsylvania would view prejudgment interest as a matter of procedure, and therefore, . . . [such court would] 'forego application of its usual conflicts analysis to determine the rule of decision' for prejudgment interest." *Optopics Laboratories,* 1997 WL 602750 at *14; *see also Simmons,* 1997 WL 430997 at *1 (same, also relying on *Yohannon*). Therefore, Pennsylvania law, and not that of California, shall control the determination in the instant matter as to the amount and availability of prejudgment interest to be awarded to the Trustee.

 "Under Pennsylvania law, . . . the rate of prejudgment interest is calcu-

---

**17.** The calculation for $4,916 follows:
(1) $134,029.50 (Outside Limit on Damages) / 1.2174 (markup rate built into $134,029.50 figure) = $110,094.87 (Outside Limit on Damages w/o profit);
(2) $110,094.87 (Outside Limit on Damages w/o profit)—$27,143.58 (Dl43 w/o profit) = $82,951.29 (Outside Limit on Damages sans profit and Dl43);
(3) $15,022 (Damages awarded by Court other than Dl43, w/o profit) / $82,951.29 (Outside Limit on Damages sans profit and Dl43) = .1811, or 18.11% (% of Outside Limit w/o Dl 43 & profit that $15,022 comprises—this is the % of Dl 43 w/o profit that should be allowed);
(4) .1811 (% arrived at on preceding line 3— i.e., the % of Dl 43 w/o profit that should be allowed) × $27,143.58 (Dl43 w/o profit) = $4,916 (portion of Dl43 w/o profit that should be allowed).

lated as simple [rather than compound] interest at a rate of six percent per year." *McDermott v. Party City Corp.,* 11 F.Supp.2d 612, 632 (E.D.Pa.1998) (citing 41 P.S. § 202). "Under Pennsylvania law, '[i]f a [contract breach] claim is liquidated, the party whose payment . . . has been withheld is entitled to prejudgment interest as a matter of right. . . .'" *E.C. Ernst, Inc. v. Koppers Co., Inc.,* 520 F.Supp. 830, 838 (W.D.Pa.1981); *see also Somerset Community Hospital v. Allan B. Mitchell & Associates, Inc.,* 454 Pa.Super. 188, 685 A.2d 141, 148 (Pa.Super.Ct.1996) (same); *McDermott,* 11 F.Supp.2d at 632 (same).

However, even if . . . [a] claim is not liquidated, and the plaintiff is not entitled to prejudgment interest as a matter of right, . . . such interest . . . [may still be awarded]. Under applicable Pennsylvania law[,] "if . . . (a) claim is not for a liquidated sum, the decision on whether (to) award (prejudgment) interest is within the sound discretion of the court." *Ernst,* 520 F.Supp. at 838; *see also Somerset Community,* 685 A.2d at 148 (noting that the Pennsylvania Supreme Court adopted § 337(a) of the Restatement of the Law of Contracts, which is now § 354 of the Restatement (Second) of Contracts, and that such pronouncement, at paragraph (2) thereof, provides, *inter alia,* that with respect to unliquidated contract breach claims, prejudgment "interest may be allowed as justice requires on the amount that would have been just compensation had it been paid when performance was due"). Horsley contends that prejudgment interest should not be awarded in the instant matter because it offered a settlement to the Debtor in April 2000, or shortly after the Debtor finished performing under the Contract. Unfortunately for Horsley, Pennsylvania law does not provide that prejudgment interest which is to be awarded under 41 P.S. § 202 shall be tolled on the basis of a settlement offer (and such tolling would not be appropriate in the instant matter in any event given that the Court's judgment, exclusive of interest, equals 163% of Horsley's $15,022 settlement offer (i.e., $24,515 / $15,022 = 1.63)).

The Court summarily holds that the Trustee's contract breach cause of action is not for a liquidated sum. Nevertheless, as set forth above, the Court may discretionarily allow prejudgment interest to the Trustee in the instant matter at the annual rate of 6%, not compounded, with such interest to accrue from February 2000 (i.e., the point by when the damages of $24,515 should have been paid to the Debtor by Horsley) to November 2005 (i.e., the present time). The Court chooses to exercise its discretion in the manner just described and, accordingly, allows to the Trustee prejudgment interest equal to $8,458—i.e., $24,515 × .06 × 5.75 [18] yrs.[19]

---

**18.** 5.75 years, which the Court uses in the calculation that precedes the instant footnote, equals 5 years and 9 months, which period the Court arrives at by not counting February 2000 but counting November 2005.

**19.** The Court notes, as an aside, that a conflict—and more than one which is merely illusory—exists between Pennsylvania law and California law regarding the amount and availability of prejudgment interest to be awarded in the instant matter. In California, in contrast to Pennsylvania, (a) the rate of prejudgment interest equals 10%, *see* Cal. Code § 3289(b) (West 2005), but (b) prejudgment interest may be discretionarily awarded on unliquidated contract breach claims only from the date upon which a claim is filed, *see* Cal.Code § 3287(b) (West 2005). Therefore, if California law had controlled resolution of the prejudgment interest issue in the instant matter, and given that the Trustee's adversary proceeding was not filed until November 2003, prejudgment interest that would have been awarded to the Trustee would then have equalled $4,903—i.e., $24,515 × .10 × 2 yrs. (11/03—11/05).

Therefore, the total damage award granted to the Trustee on her contract breach cause of action, inclusive of appropriate prejudgment interest, that is the judgment to be entered by the Court in favor of the Trustee on such cause of action, equals $32,973—i.e., $24,515 damages + $8,458 interest.

## IV. *Issues Regarding the Five Depositions.*

As an initial matter, the Court notes, as set forth above, that, save for the $32,973 judgment that will be entered in the Trustee's favor, the Court determines that the Trustee failed to preponderantly prove all elements of her contract breach claim— and, in particular, that any breach of the Contract by Horsley caused damage to the Debtor—without any resort to the five depositions that were offered into evidence by Horsley. Implicit in such ruling by the Court is its prior determination that those depositions, coupled with other evidence of the Trustee, do nothing, or are at least insufficient from a proof standpoint, to aid the Trustee in proving her contract breach claim. Of course, because the Court will enter judgment in favor of the Trustee on her contract breach claim to the extent of $32,973, the Court also implicitly holds that such depositions, either by themselves or in concert with other evidence, are insufficient to defeat the Trustee's contract breach claim to the extent that she prevails thereon. Because the five depositions essentially do nothing to change the Court's ultimate decision, the Court really need (a) not even address whether such depositions serve to further disprove the Trustee's contract breach claim relative to a judgment in excess of $32,973, or whether such depositions operate to aid the Trustee in establishing such claim to the extent of $32,973, and (b) say nothing more relative to such depositions. The foregoing notwithstanding, the Court feels obliged to at least minimally address the five depositions.

As set forth above, Horsley's defense by way of presentation of witnesses consists of the deposition transcripts of five individuals—in particular, two individuals from Anchor (namely George Archer, the owner thereof, and Kenneth Krajnak), two employees of Horsley (namely Mike Tooley and Ryan Briggs), and the widow of the deceased owner of Horsley (namely Nancy Horsley). The Trustee, as a threshold matter, sought to preclude entirely the admission into evidence of the deposition transcripts of each of the three individuals affiliated with Horsley, as well as apparently that of Kenneth Krajnak. The Trustee did not object to the admission into evidence of the George Archer deposition.

### A. *The depositions of the 3 Horsley-affiliated individuals.*

With respect to the depositions of the three Horsley-affiliated individuals, Horsley contends, and the Court agrees, that such depositions may be admitted into evidence pursuant to Fed.R.Civ.P. 32(a)(3)(B), made applicable to the instant matter via Fed.R.Bankr.P. 7032, because such individuals all (a) are from Utah— where Horsley itself is located—and, consequently, (b) were at a greater distance than 100 miles from this Court. The Trustee objects to the use of the depositions of the three Horsley-affiliated individuals on several grounds, to wit that (a) the absence of such individuals at trial was procured by Horsley, (b) such depositions are discovery depositions that were initiated or conducted by the Trustee herself (actually the Trustee's counsel), and (c) it would be unfair to allow Horsley to use such depositions at trial given that Horsley (i) listed such individuals as prospective witnesses in its Pre–Trial Statement, and (ii) ultimately failed to call such individuals as

witnesses at trial. The Court overrules each of the foregoing objections for the reasons set forth below.

 First, Horsley did not procure the three Horsley-affiliated individuals' absence from trial. The Trustee appears to argue that the procurement of such absence is conclusively established by virtue of the fact that such individuals were employed by Horsley at the time of trial, yet Horsley did nothing to ensure their presence at trial. Unfortunately for the Trustee,

> [u]nder the case law interpreting Rule 32, the mere fact that the deponents are employed by the defendant and that there is an identity of interest between the deponents and their employer is not enough to trigger exclusion because "procuring absence and doing nothing to facilitate presence are quite different things."

*Carey v. Bahama Cruise Lines,* 864 F.2d 201, 204 (1st Cir.1988); *see also Houser v. Snap–On Tools Corp.,* 202 F.Supp. 181, 189 (D.Md.1962) ("procuring absence and doing nothing to facilitate presence are quite different things, and here we have no showing or allegation that Snap–On actively took steps to keep the deponents from setting foot in the courtroom").[20] The Court also notes that some courts (a) distinguish between fact witnesses and expert witnesses, (b) then take the position that a party procures the absence of expert witnesses that it chooses with knowledge that such experts are, or will be at the time of trial, outside the 100–mile radius of a court, and (c) accordingly disallow the use at trial by such party of such expert's

deposition. *See Aubrey Rogers Agency, Inc. v. AIG Life Insurance Co.,* 2000 WL 135129 at *3 (D.Del.2000). Such case authority, of course, may not be relied upon by the Trustee to exclude from evidence the depositions of the three Horsley-affiliated individuals given that such individuals constitute fact rather than expert witnesses (and a party cannot choose fact witnesses or where they happen to reside).

 Second, Horsley cites no authority, and we know of none, in support of the proposition that discovery depositions may not be used at trial against the party who conducted them. On the contrary, Federal Rule of Civil Procedure 32 provides that depositions of witnesses "may be used by any party for any purpose if the court finds: … (B) that the witness is at a greater distance than 100 miles from the place of trial or hearing, or is out of the United States."

*Savoie v. Lafourche Boat Rentals, Inc.,* 627 F.2d 722, 724 (5th Cir.1980); *see also Tatman v. Collins,* 938 F.2d 509, 511 (4th Cir.1991) ("It is irrelevant to the issue [of whether a deposition may be admitted into evidence] that one party or the other initiated the deposition, [or] that it was initiated only for discovery purposes"); *Reilly v. Reilly,* 671 P.2d 330, 333 (Wyo.1983) (same, and "[t]he decision to avail oneself of depositions of witnesses involves the risk that these depositions will have an evidentiary value and may be used at trial. One should prepare accordingly"). Therefore, that the depositions of the three Horsley-affiliated individuals are discovery depositions that were initiated or conduct-

**20.** Horsley's counsel contends, and the Trustee's counsel does not dispute, that (a) Horsley and its counsel did nothing to prevent the three Horsley-affiliated individuals from appearing at trial if they so wished, and (b) the most that Horsley's counsel did was to inform such individuals that they did not need to attend the trial if they did not wish to do so, which instruction amounts to nothing more than a benign failure to facilitate such individuals' presence at trial.

ed by the Trustee's counsel is not a basis for sustaining the Trustee's objection to the use by Horsley of such depositions at trial.

■ Third, that Horsley listed the three Horsley-affiliated individuals as prospective witnesses in its Pre–Trial Statement, and that such individuals were ultimately not called by Horsley as witnesses, does not constitute a ground for excluding such depositions from evidence. The Court so holds because (a) Horsley, in its Pre–Trial Statement, expressly "reserve[d] the right to amend this witness list up to and including the time of trial," (b) Horsley, by virtue of such express reservation, did not so commit itself to produce the three Horsley-affiliated individuals as witnesses, and (c) Horsley, in any event, had no obligation to call any witnesses, let alone individuals that it essentially represented that it might or might not call— Horsley, by virtue of its Pre–Trial Statement, was only prevented from calling as witnesses those individuals who are not listed therein as prospective witnesses.

Because the Court overrules each of the foregoing objections by the Trustee, the depositions of each of the three Horsley-affiliated individuals are admitted into evidence in their entirety subject to particularized objections raised by the Trustee. The Court agrees with some of such particularized objections by the Trustee, particularly those regarding the deposition testimony of Ryan Briggs. Unfortunately for the Trustee, the Court finds to be very relevant, and very damaging as well, to the Trustee's contract breach claim the deposition testimony of Mike Tooley found at p. 81, line 7—p. 82, line 1 of his deposition transcript—the Court finds such deposition testimony to be very damaging, in part, because, "[alt]hough live testimony is preferred, depositions, when admissible, are not to be treated as a form of second-class evidence," 8A Charles Alan Wright, Arthur R. Miller & Richard L. Marcus, *Federal Practice and Procedure (Federal Rules of Civil Procedure)* § 2146 (2nd ed.2005); *see also Meacham v. Barber,* 183 Ga.App. 533, 359 S.E.2d 424, 429 (1987) ("deposition testimony [i]s certainly not of a 'weaker and inferior nature' " when compared to live testimony). Such testimony strongly tends to refute the Trustee's position that (a) Horsley and/or its subcontractors caused 100% of the damages that the Trustee contends the Debtor incurred, and (b) the Debtor himself was not responsible for any of such damages. So damaging, in fact, does the Court find such testimony to be that, if it were necessary to a resolution of the Trustee's contract breach claim, the Court would hold that such testimony, by itself, makes it at least as likely as not that (a) Horsley and/or its subcontractors did not cause 100% of the damages that were incurred by the Debtor, and (b) the Debtor himself caused some of his own damages.

### B. *The depositions of the 2 Anchor individuals.*

Regarding the depositions of the two Anchor individuals, Horsley contends, and the Court agrees, that such depositions may be admitted into evidence pursuant to Fed.R.Civ.P. 32(a)(3)(B) because such individuals both (a) are from Cleveland, Ohio—where Anchor itself is located—and, consequently, (b) were at a greater distance than 100 miles from this Court. As set forth above, the Trustee does not even object to the admission into evidence of the George Archer deposition. The trial record reveals that the Trustee (actually the Trustee's counsel) expressly, albeit orally, also waived at trial any objection to the admission into evidence of the Kenneth Krajnak deposition. *See* Trial Record, 1/27/05, at 3:25:45 p.m. Notwithstanding such latter waiver, the Trustee now appears to object to the admission of the

Krajnak deposition, as evidenced by the Trustee's representation contained in her counsel's February 2, 2005 letter to the Court that she now wishes to advance the objection to such deposition that is set forth at the outset of the same.

 In particular, the Trustee so objects on the basis that the Krajnak deposition was taken by Horsley's counsel subsequent to the passage of the discovery deadline imposed by the Court in the instant adversary proceeding.[21] Unfortunately for the Trustee, the Court shall hold the Trustee to her counsel's express waiver of such an objection. Moreover, the Court also overrules such objection substantively, and notwithstanding that such discovery deadline had indeed passed when the Krajnak deposition was taken, because (a) the Krajnak deposition—and, for that matter, the Archer deposition as well—is a properly noticed preservation deposition, that is a deposition that was taken for the purpose of preserving for trial the testimony of Krajnak, a witness unavailable for trial (in contrast to a discovery deposition), and (b) preservation depositions are not subject to, that is may be taken outside of, a discovery deadline. *See Charles v. F.W. Wade,* 665 F.2d 661, 664 (5th Cir.1982); *Estenfelder v. Gates Corp.,* 199 F.R.D. 351, 356 (D.Colo.2001); *RLS Associates, LLC v. The United Bank of Kuwait PLC,* 2005 WL 578917 at *6 (S.D.N.Y.2005). Therefore, the Krajnak deposition is admitted into evidence in its entirety subject to particularized objections raised by the Trustee.

The Court agrees with some of the particularized objections by the Trustee regarding the deposition testimony of both Archer and Krajnak. Unfortunately for the Trustee, the Court finds to be admissible, as well as very damaging to the Trustee's contract breach claim, most of the deposition testimony of Krajnak found at p. 20, line 12—p. 27, line 6 of his deposition transcript. Such testimony strongly tends to refute the Trustee's position that (a) Horsley and/or its subcontractors caused 100% of the damages that the Trustee contends the Debtor incurred, and (b) the Debtor himself was not responsible for any of such damages. So damaging, in fact, does the Court find such testimony to be that, much like was the case with respect to the particular Tooley deposition testimony noted above, if it were necessary to a resolution of the Trustee's contract breach claim, the Court would hold that such testimony, by itself, makes it at least as likely as not that (a) Horsley and/or its subcontractors did not cause 100% of the damages that were incurred by the Debtor, and (b) the Debtor himself caused some of his own damages.

## V. Adverse Inferences Sought by the Trustee.

### A. Missing Witness Inferences.

The Trustee asks that the Court draw an adverse inference from the failure by each of the three Horsley-affiliated individuals to appear and testify at trial.

 "The basis of the 'missing witness' inference is that, where a party fails to call an available witness whose testimony could be expected to favor him, a natural inference arises that that witness would have exposed facts unfavorable to that party." *United States v. Busic,* 587 F.2d 577,

---

21. The Trustee does not object to the admission into evidence of the Krajnak deposition on the ground that Horsley procured Krajnak's absence from trial, which is understandable given that Krajnak is neither an employee of Horsley (not that such status, as set forth above, would constitute a meritorious basis for such objection) nor Horsley's expert witness.

586 (3rd Cir.1978); *see also United States v. American Radiator & Standard Sanitary Corp.*, 433 F.2d 174, 206 (3rd Cir. 1970) (stating general rule in somewhat similar fashion); *United States v. Restaino*, 369 F.2d 544, 547 (3rd Cir.1966) (same); 29 Am.Jur.2d *Evidence* § 247 (West 2005) (same); 75B Am.Jur.2d *Trial* § 1315 (West 2005) (same).[22] The missing witness inference is inapplicable unless the information possessed by the absent witness is both material, that is relevant to the case, and non-cumulative. *See Busic*, 587 F.2d at 586; *American Radiator*, 433 F.2d at 206; *Restaino*, 369 F.2d at 547; *LaMarca v. United States*, 31 F.Supp.2d 110, 128 (E.D.N.Y.1999). "[W]hen it is shown why the witness was not called upon to testify and the reasons for not calling him are reasonable and proper, no inference that his testimony would be unfavorable is permitted." 29 Am.Jur.2d *Evidence* § 247; *see also American Radiator*, 433 F.2d at 206 (same); 75B Am. Jur.2d *Trial* § 1315 (same).

■■■■ The foregoing general rules regarding the missing witness inference have been subjected to numerous refinements over many years. For instance, drawing the missing witness inference is inappropriate "if a party has good reason to believe his opponent has failed to meet his burden of proof." *Int'l Union, UAW v. N.L.R.B.*, 459 F.2d 1329, 1338 (D.C.Cir. 1972); *see also Busic*, 587 F.2d at 586 ("calculations that a witness may help a lot but hurt a little may compel restraint when counsel believes that his burden is

already met"). As well, "if the other party or *the judge* plays a role in suppression of the evidence [that is not introduced or a failure to call a witness], the force of the [adverse] inference is dissipated." *Int'l Union, UAW*, 459 F.2d at 1338 (emphasis added).

■■■■ Depositions also play a role in whether or not a missing witness inference should be drawn. For instance,

> [live] testimony may be considered cumulative, in view of the witness's testimony at a deposition, if the deposition testimony was not of a weak or inferior nature so as to create an unfavorable presumption, where nothing in the deposition testimony gives rise to a sound inference that the witness's testimony at trial would have been unfavorable, or where the deposition indicated that it would be doubtful that the missing witness could have shed any more light on the question at issue.

29 Am.Jur.2d *Evidence* § 255 (West 2005) (citing *Meacham*, 359 S.E.2d at 429; and *Kerr v. Allard*, 130 N.H. 247, 536 A.2d 197, 199 (1987)). Of course, if live testimony is rendered cumulative by virtue of a deposition, then, as set forth above, a missing witness inference may not be drawn from the failure to produce such live testimony. Furthermore,

> when a trial judge can conveniently test the soundness of . . . [allowing a missing witness inference,] it is entirely proper that he do so before allowing . . . [such inference].

Therefore, the Court shall apply federal law, and Third Circuit case authority wherever possible, in resolving issues dealt with in this portion of the instant opinion; of course, the Court is free to, and thus does, apply federal law other than Third Circuit case authority, and even state caselaw, to the extent that the Court finds such authorities to be persuasive.

---

**22.** Adverse inferences fall outside the scope of Fed.R.Evid. 302, which means that Rule 302 "does not require that we apply state law" regarding the application of such inferences. *Herbert v. Wal–Mart Stores, Inc.*, 911 F.2d 1044, 1047 (5th Cir.1990). Furthermore, in federal trials federal law rather than state law applies regarding application of rules regarding adverse inferences. *See Id.* at 1047–48.

If, for example, the party against whom the ... [missing witness inference] would be directed can expeditiously show that the absent witness would not have testified unfavorably to him, his opponent's comment on the witness's absence would be misleading and unfair. And, if, as in this case, an existing deposition would reveal the probable substance of the witness's testimony, the trial judge may properly forbid comment on the witness's absence unless the party wishing to make the comment proffers a portion of the deposition indicating that the witness probably would have been unfavorable to the other side. *Kerr,* 536 A.2d at 199 (J. Souter); *see also Bent Glass Design, Inc. v. Brandt Manufacturing Systems, Inc.,* 1991 WL 60595 at *4 (E.D.Pa.1991) (if plaintiff has opportunity to introduce all or part of witness' deposition and declines to do so, then such failure dispels possible inference that such witness' live testimony would have been adverse to defendant's interest). Finally, and perhaps most importantly, the Third Circuit appears to have held that, if a party introduces into evidence depositions of witnesses, then a missing witness inference may not be drawn against such party for the failure to call such witnesses at trial. *See Pitchford v. PEPI, Inc.,* 531 F.2d 92, 106–07 (3d Cir.1976) ("the charge would not suggest to the jurors that the failure to produce witnesses in person when their depositions had been offered in evidence is a foundation for an adverse inference"). Why did the Third Circuit so hold? Perhaps it is because, as set forth above, live testimony would be cumulative if a deposition were also introduced into evidence. Perhaps it is because (a) a deposition of a witness may be taken by either party, (b) such opportunity to take such deposition perhaps makes such witness equally available to either party, *see LaMarca,* 31 F.Supp.2d at 128 (witnesses

equally available to plaintiff because plaintiff, *inter alia,* could have deposed witnesses and sought to enter into evidence any part of such depositions); *Cromling v. Pittsburgh and Lake Erie R.R. Co.,* 327 F.2d 142, 149 (3rd Cir.1963) (3rd Circuit held that witness was available even though not subject to a court's subpoena power because a deposition could have been taken of such witness and then offered into evidence), and (c) a missing witness inference may not be drawn if a witness is equally available to either party and such witness is not called to testify, *see Busic,* 587 F.2d at 586–87; *American Radiator,* 433 F.2d at 206; *LaMarca,* 31 F.Supp.2d at 128. Perhaps it is because, if a party offers a deposition into evidence, and if such deposition makes it clear than an adverse inference would be improper, then a missing witness inference may not be drawn from such witness' failure to testify. Whatever the reason, it appears that the Third Circuit would prohibit the drawing of an adverse inference if a deposition is introduced by the party against whom such inference is sought to be drawn.

■ Applying the foregoing law to Horsley's failure to call as witnesses at trial the three Horsley-affiliated individuals, the Court holds that it may not draw a missing witness inference with respect to any of such individuals. The Court so holds with respect to Horsley's failure to call Mike Tooley, in particular, because:

(a) Tooley's absence was satisfactorily explained, to wit his wife was giving birth to his child when the trial regarding the instant matter was held, *see* Ex. A to Horsley's Post–Trial Mem. (copy of birth certificate—Tooley child born on 1/27/05); and

(b) Horsley wished to call Tooley as a witness notwithstanding his unavailability at trial due to the impending

birth of his child, as evidenced by Horsley's motion requesting that the trial record be left open so that Tooley could testify later (Doc. No. 53), which motion the Court denied—although the Court denied such motion, and properly so, it would be improper for the Court to draw a missing witness inference from Tooley's absence at trial given that the Court essentially ensured that he would not testify at trial.

The Court so holds with respect to the absence of Tooley and Ryan Briggs, in particular, because an examination of the transcripts of those individuals' depositions allows the Court to conclude that, if they had testified at trial, they would have done so in a fashion that was favorable to Horsley and unfavorable to the Debtor. The Court so holds with respect to Nancy Horsley's absence, in particular, because the information that she would have provided at trial, the Court concludes, is largely, if not entirely, immaterial to a resolution of the Trustee's causes of action; the Court draws the latter conclusion because much of what Nancy Horsley would have testified to regards how much Horsley itself made on the Tracy Job, and the whereabouts of Horsley's Tracy Job Financials, all of which the Court finds to be totally irrelevant to the Trustee's causes of action.

The Court also refuses to draw an adverse inference from Horsley's failure to call as witnesses any of the three Horsley-affiliated individuals because

(a) the Court holds, in turn, that live testimony from each of such individuals would have been entirely cumulative in light of their deposition testimony and the admission into evidence of the transcripts of such deposition testimony;

(b) Horsley's counsel believed, at the close of the Trustee's case at trial, that the Trustee had not met her burden of proof, which belief is clearly evidenced by Horsley's counsel's motion for a directed verdict—the Court finds comfortably that Horsley's counsel had good reason to (i) believe that the Trustee failed to meet her burden of proof, and (ii) move for a directed verdict, even though, actually largely since, the Court ultimately determines that it must grant judgment in the Trustee's favor but only to the relatively minor extent of $32,973; and

(c) Horsley introduced into evidence the depositions of each of such individuals, given, as set forth above, the law that arguably exists in the Third Circuit by virtue of the *Pitchford* decision (i.e., the rule that, if a party introduces into evidence depositions of witnesses, then a missing witness inference may not be drawn against such party for the failure to call such witnesses at trial).

**B.** *Missing Evidence Inferences.*

The Trustee furthermore asks that the Court draw an adverse inference from the failure by (a) Mike Tooley to produce Tooley's Job Notes at trial or during discovery, and (b) Nancy Horsley to produce Horsley's Tracy Job File and Horsley's Tracy Job Financials at trial or during discovery.

In order to draw an adverse inference from a party's failure to produce evidence, the party requesting that such inference be drawn must prove that (a) such evidence is relevant to an issue in the case, (b) the evidence in question is within the control of the party against whom the inference is sought to be drawn, and (c) there has been an actual suppression or

withholding of the evidence in question. *See Brewer v. Quaker State Oil Refining Corp.,* 72 F.3d 326, 334 (3rd Cir.1995). "No unfavorable inference arises when the circumstances indicate that the document or article in question has been lost or accidentally destroyed, or where the failure to produce it is otherwise properly accounted for." *Id.; see also* 29 Am. Jur.2d *Evidence* § 244 (West 2005) (adverse inference arises from loss of evidence "only where the act [resulting in such loss] was intentional, and indicates fraud and a desire to suppress the truth, and it does not arise where the destruction was a matter of routine with no fraudulent intent").

 Applying the foregoing law to the Trustee's missing evidence inference requests, the Court holds that it may not draw an adverse inference from:

(a) Mike Tooley's failure to produce Tooley's Job Notes because the Trustee fails to preponderantly prove that Tooley's loss of such job notes was anything other than the result of accident;

(b) Nancy Horsley's failure to produce Horsley's Tracy Job File because the Trustee fails to preponderantly prove that Nancy Horsley ever even had control of such job file (the Court finds that it is at least as likely as not that Horsley's Tracy Job File was destroyed in the airplane crash that took the life of the deceased owner of Horsley), let alone that she desired to, and did, suppress such job file; and

(c) Nancy Horsley's failure to produce Horsley's Tracy Job Financials—the Court so holds if for no other reason than that such records are irrelevant to an issue respecting the Trustee's causes of action.

## CONCLUSION

In light of all of the foregoing, the Court grants judgment (a) in Horsley's favor with respect to, that is denies any recovery on, the Trustee's quantum meruit cause of action (Count 2), and (b) in favor of the Trustee on her contract breach cause of action (Count 1), but only to the extent of $32,973 in damages.

An appropriate order will be entered.

## *ORDER OF COURT*

**AND NOW**, this **10th day** of **November, 2005**, upon consideration of the two remaining counts in the Trustee's three-count adversary action, namely Count 1 for breach of contract and Count 2 for a recovery in quantum meruit;

and subsequent to notice and a trial on the instant matter held on January 26—27, 2005;

and for the reasons set forth in the accompanying Memorandum Opinion dated **November 10, 2005**;

it is **hereby ORDERED, ADJUDGED, AND DECREED** that:

(a) **Horsley prevails** on the Trustee's **quantum meruit** cause of action **(Count 2)**, that is **recovery is denied** in its entirety on such cause of action, and

(b) **the Trustee prevails** on her **contract breach** cause of action (**Count 1), but only to the limited extent of $32,973 in damages.**